In re the ADOPTION OF S.

No. KCD 30089.

Missouri Court of Appeals,
Western District.

April 30, 1979.

Robert G. Neds, Roger D. Odneal, Raytown, for appellant.

Thomas M. Sullivan, Eileen S. Sullivan, Kansas City, for respondents.

Before SHANGLER, P. J., and WASSERSTROM and CLARK, JJ.

WASSERSTROM, Judge.

This is an adoption case in which the natural father refused to consent to the adoption. The principal question for decision is whether the father willfully abandoned or willfully neglected the child so that any necessity for his consent has been eliminated under the provisions of Section 453.040(4), RSMo1969.

The facts are for the most part undisputed. In the few instances of conflict, the facts will be taken as found by the trial court, pursuant to the deference prescribed by Rule 73.01–3.

The child S was born August 20, 1968. His parents, A (the mother) and J (the father) were divorced March 7, 1969, when S was less than one year old. The divorce decree granted custody to A and required J to pay child support of $20 a week.

At the time of the divorce A was 19 or 20 years old. Beginning in May, 1969, she left S with Mr. and Mrs. B to babysit while she was at work. The arrangements were that

A was to pay $10 a week, furnish a daily lunch and milk and provide all laundry requirements. A fell badly behind in the agreed payments, and the Bs found it necessary to also supply the milk, lunches and do the laundry. A gradually left S with the Bs for more and more time, and S came under practically the sole care and supervision of the Bs starting in 1970. In February, 1971, A declared, "I don't want no more to do with him" and left the child with the Bs on a permanent basis. Since that time the Bs have heard from A only once or twice.

At the time of the divorce J also was 19 or 20 years of age. During all the time that A undertook the responsibility for the child, J supplied a total of only $320, the last payment of which was in August, 1969. At least part of these payments came through the intervention of the prosecutor's office to whom A had turned for help in collecting the child support decreed in the divorce proceedings. After the Bs took over custody, Mrs. B suggested to J on various occasions what was needed by S, but J would decline to assist in those needs on the excuse that he had a car payment or some other obligation of his own to meet. J did furnish a few items of clothing in 1972, and during the course of 1972 and 1973 he supplied to or for the benefit of S sums aggregating $135.50. During all of the time that the Bs had custody, J made only relatively few visits, the last of which occurred in August, 1973. At no time did J ever request custody of S.

The Bs entered S in kindergarten in the fall of 1973. The school authorities advised them that S would be restricted in activities unless the Bs put themselves into a position to give authority for S to participate in such activities as school athletics. At that time, the Bs exhibited to the school authorities a letter which had been signed by A on February 27, 1971, identified in evidence as Exhibit 3, in which A stated that she did "hereby grant the care of the above men-tioned child to [Mrs. B] to care for in the event of emergency, i. e. to be cared for by a Doctor or Hospital at their [sic] own discretion, to take care of him in all matters concerning his welfare." Notwithstanding that letter, the school authorities took the position that the Bs could not give the necessary permission short of becoming adoptive parents. Shortly thereafter, on October 12, 1973, the Bs did file their original petition for adoption in this case.

After the filing of that petition, J retained an attorney, Mr. Lee Shapiro, who resisted the adoption proceeding and also filed a motion in the divorce action to modify the decree pertaining to custody. Shapiro proceeded with the latter motion to the point of calling it up for hearing, but J refused to go along with the motion on the ground that he thought that it was for the best interest of S to remain with the Bs and he therefore did not want to seek any change in the existing custody. Also J testified, "I couldn't do it * * * He had been in the home too long."[1] Thereupon Mr. Shapiro withdrew from representation of J on the grounds that there was a failure of a meeting of the minds between lawyer and client. Thereafter followed a succession of attorneys on behalf of J, the last of whom was present counsel who entered the case only shortly before trial.

The Bs filed a second amended petition on September 30, 1977, in which they alleged that J had willfully abandoned and willfully neglected S for one year immediately before the date of the original petition and also for one year immediately preceding the second amended petition. A filed consent to the adoption, but J declined to consent and vigorously contested the adoption. At the conclusion of the trial, the trial court made detailed findings of fact and conclusions of law adjudging that J had willfully abandoned and willfully neglected S both during the period October 12, 1972, to October 12, 1973, and also during the

1. J also testified in the trial court that Shapiro advised him "that the case was a problem and that if I wanted that child to kidnap him, just to kidnap the child." This portion of J's testimo-ny is less credible than the interpretation of the occasion for and nature of the disagreement between him and Mr. Shapiro, as stated above.

period September 30, 1976, to September 30, 1977. On that basis, the trial court granted temporary custody to the Bs and made that determination final for purpose of appeal.[2]

## I.

### Necessity for Consent by J

■ J's first point on appeal is that he had contributed to the support of S during the one year prior to the original petition, so that his consent to the adoption was not obviated under Sec. 453.040(4).[3] A threshold question is suggested as to whether the statutory year mentioned dates back from the filing of the original petition (making the year October 12, 1972, to October 12, 1973) or from the date of the second amended petition (which would make the statutory year September 30, 1976, to September 30, 1977). If the latter, there would be much less difficulty in finding abandonment and neglect, because during that year J paid no money and made no visits whatsoever. However, it is unnecessary to decide which span of time is the controlling statutory one year, because even assuming most favorably to J, that October 12, 1972, to October 12, 1973, constitutes the statutory period, that makes no difference in result. This conclusion flows from the legal principle that in determining whether there has been abandonment or neglect, conduct of the parent both before and after the one year statutory period must be considered. *Adoption of R.A.B. v. R.A.B.,* 562 S.W.2d 356 (Mo. banc 1978); *D.A.Z. v. M.E.T.,* 575 S.W.2d 243 (Mo.App.1978); *Matter of Adoption of Fuller,* 544 S.W.2d 345 (Mo. App.1976); *D\_\_\_\_ G\_\_\_\_ K\_\_\_\_ v. D\_\_\_\_ G\_\_\_\_ K\_\_\_\_,* 545 S.W.2d 81 (Mo.App.1976); *In re Adoption of K.,* 417 S.W.2d 702 (Mo.App.1967).

### A. Willful Abandonment

In analyzing the issue of abandonment, a remarkable feature of this case is the frank admission of J that he does not want custody of the child and that the best interests of S call for him to remain in the custody of the Bs. This alone would serve to bring this case within one judicial definition of willful abandonment, which is " 'conduct of the parents indicating a settled intention to leave the child permanently in the care of others.' " *Application of Graham,* 239 Mo. App. 1036, 199 S.W.2d 68, 74 (1947). This abdication of care and custody by J also shows an "intent or mental attitude to forsake the status of a parent." *Adoption of R.A.B. v. R.A.B., supra.* And also it would fall within the definition of abandonment as the "intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love, and his protection, maintenance, and the opportunity for the display of filial affection." *D\_\_\_\_ G\_\_\_\_ K\_\_\_\_ v. D\_\_\_\_ G\_\_\_\_ K\_\_\_\_, supra.*

■ There is another frequently used definition of abandonment as meaning " 'a settled purpose to forego all parental duties and relinquish all parental claims.' " See for example, *In Re E.C.N.,* 517 S.W.2d 709, 715 (Mo.App.1974). However, that definition should not be understood as permitting a parent to insist upon prying apart the two elements of "claims" and "duties." These two aspects of the parental-child relationship are opposite sides of the same coin. They should be and are inseparable. A parent should not be able to treat a child as a plaything to pick up for sporadic enjoyment at his whim, while at the same time disclaiming the burdens, sacrifices, and oft times pains of nurturing and caring for the child. That in essence represents what J argues for here.[4] In view of J's plain and

---

**2.** The latter special ruling serves to distinguish the present case from *Marsch v. Williams,* 575 S.W.2d 897 (Mo.App.1978).

**3.** Sec. 453.040(4) provides: "The consent of the adoption of a child is not required of (4) A parent who has for a period of at least one year immediately prior to the filing of the petition for adoption, either willfully abandoned the

child or willfully neglected to provide him with proper care and maintenance."

**4.** Witness J's testimony as follows: "Q. Now, do you feel it is in [S's] best interest that he remain in the custody of Mr. and Mrs. [B]? A. Yes, I do. Q. Do you feel it is in his best interest that you not be able to see [S]? A. No. Q. Explain that to the judge. A. Well, I'm his

open disavowal of duties and any responsibility for the bringing up of S, he has brought himself within all the commonly employed definitions of abandonment. *In re Adoption of K., supra,* at p. 711; *Matter of Adoption of Fuller, supra,* at p. 350.

### B. *Willful Neglect*

■ Whatever possible doubt there might be about abandonment, there can be none at all about J's willful neglect. Willful neglect has been defined as neglect that is " 'intentional, deliberate, and without just cause or excuse, evincing a settled purpose to forego . . . parental duties over the period of time which the statute prescribes.' " *D_____ G_____ K_____ v. D_____ G_____ K_____, supra.* J's conduct clearly falls within that concept. During the approximately two year period of custody by A, J paid only $320 and this despite a court order calling for $20 per week and efforts by A to enforce that order through the prosecutor's office. During the next period of time when S was in the custody of the Bs, J did even less. During this latter period of almost seven years, he came up only with a few items of clothing and the meager sum of $135.50. This failure of payment occurred despite the fact (found by the trial court and not challenged by J) that "Respondent [J], had the financial ability to provide proper care and maintenance for the minor child, [S], during both statutory one-year periods in question."

In addition to the paltriness of money support, J made very few visits or efforts to see S. All in all, his conduct is kin to the "very minimal" contact and support which was held insufficient in *R.F.N. v. G.R.,* 546 S.W.2d 510 (Mo.App.1976). Also close in point is *In re Adoption of K., supra,* where sporadic visits and Christmas and birthday presents were considered insufficient, the court remarking that the parent "never seriously considered assuming the burdens

and obligations of parenthood." See also *D.A.Z. v. M.E.T., supra,* where it was held that the furnishing of minor gifts was not sufficient to negate neglect and abandonment and where the court remarked that the father's "efforts to support his child or maintain contact with her were sporadic and non-existent for long periods."

The fact that this situation came to a head at the time when S entered school holds special significance. That marked a climactic point in the life and development of S, when he had a very special need for parental guidance and psychological support. At this critical juncture, J was not around to perform the vital parental function and this role and responsibility fell upon the Bs. In this respect, the present case bears strong analogy to *Matter of Adoption of Fuller, supra,* where custody rested in adoptive parents at the time the children there in question entered school. In discussing that situation, the court stated:

> "The responsibility for the rearing of these two children, ages 6 and 5 in 1969, fell squarely and completely upon respondents. At the time these children started school, a time of emotional adjustment for many youngsters, it was the respondents and not appellant who provided the understanding and security so often necessary for a healthy adjustment in school."

All the cases cited by J, where the parent was found not guilty of abandonment or neglect, have been read and considered. So also have the recent decisions in *Adoption of R.A.B. v. R.A.B., supra,* and *In re Adoption of LeGrande,* 581 S.W.2d 414 (Mo. App.1979). All those cases are factually distinguishable. An individual discussion of each case would unduly and unprofitably extend this opinion.

---

father. Q. You feel that Mr. and Mrs. [B] have done an acceptable job of raising [S]? A. I think they have. Q. You have no particular objection if they keep [S], is that right? A. No. . Q. But you do want, if I understand, to have visitation rights with him? A. Yes, I do."

To be noted is that nowhere in his testimony did J indicate any feeling of obligation or even inclination to offer any financial or other assistance, and his past conduct demonstrates his negative attitude in that regard.

The determination of the trial court with respect to abandonment and neglect on the part of J did not incorrectly declare or apply any legal principle, it is supported by substantial evidence, and it is not against the weight of the evidence. Accordingly that determination is entitled to affirmance under *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). *Adoption of R.A.B. v. R.A.B., supra; R.F.N. v. G.R., supra.*

## II.

### *Admission of Exhibit 3*

J's only other point on appeal is that Exhibit 3 was improperly admitted into evidence. Without in any way reflecting disagreement with the ruling of the trial court, it is unnecessary to consider J's objection on the merits. In a court tried case like this, "it is practically impossible to predicate reversible error on the erroneous admission of evidence. The party advancing the contention must demonstrate the absence of sufficient competent evidence to support the trial court's decree." *Broyles v. Broyles,* 555 S.W.2d 696 (Mo.App.1977); *Gould v. Starr,* 558 S.W.2d 755 (Mo.App. 1977). J has not carried that burden.

Affirmed.

All concur.