**In the Matter of Michael O'BRIEN, a person alleged to be mentally ill.**

**No. WD 31807.**

Missouri Court of Appeals, Western District.

June 9, 1980.

June Clark, Polsinelli, White & Schulte, Kansas City, for appellant.

Stephen H. Stiller, Kansas City, for respondent.

Before TURNAGE, P. J., and SHANGLER and MANFORD, JJ.

TURNAGE, Presiding Judge.

Michael O'Brien was ordered committed to the Western Missouri Mental Health Center for 14 days upon a finding by the court under § 202.135, RSMo 1978, that Michael, as a result of a mental illness, presents a likelihood of serious physical harm to himself or to others.

On this appeal Michael contends there was no clear, cogent and convincing evidence to show that he presented a likelihood of serious physical harm to himself or to others.

This court heard oral arguments and at the conclusion thereof issued an order discharging Michael from custody with an opinion to follow.

Michael's mother, Mrs. Josephine O'Brien, and Dr. Annie Thomas, a psychiatric resident physician, testified at the hearing to determine whether or not Michael should be involuntarily detained for a 14-day period. Mrs. O'Brien testified that she came home from the hospital, where her mother had just died, and met Michael who appeared to be angry. She said Michael had on one of his father's good coats and told her that he wanted to show her what he had done. He took her by the arm and took her downstairs to the basement. She stated that she did not want to go, and although she had never been scared of Michael before, at that time she was nervous because of her mother's death and she said she was "kind of scared" of Michael. When she got downstairs, Michael said that everything was nice, just the way he wanted it to be. She stated, in fact, that the basement was a disaster area with lines cut, all the clothes on the floor and things turned over. He had apparently removed all the fuses from the electrical fuse box and had broken a window. They went upstairs and he showed her his father's room. There he had knocked everything over and a couple of things were broken. She then told Michael that she was going outside for a while, and he told her he wanted some matches. She told him she did not have any. He asked for a cigarette lighter and she told him she did not have that. He stated he wanted one right now and she inquired as to the reason he wanted these. He said that she would see and she was just to get them. She said he got real mad and started yelling, and she stated she would see what she could do. She then asked him if he was going to burn the house down and he said, " 'Well, you'll see if I'm going to burn the house down. . . . I—you'll find out when I—when you get the matches and cigarette lighter. And I'm going to finish the job that I started to do.' You know, whatever that meant I don't know."

Mrs. O'Brien ran to a neighbor's house, the police were called, and they picked up Michael.

On cross-examination Mrs. O'Brien stated Michael did not attempt to hit her, nor did he threaten her in any way.

Dr. Annie Thomas stated she was a resident physician in psychiatry at Western Missouri Mental Health Center. She had observed Michael daily from April 25 through May 1, 1980, at the Center. She stated Michael was restless and had delusions against his father. She stated he believed his father manipulated him with his Seiko-Deneral watch. He thinks his father built in all sort of electrical wires and pulled Michael to get him into the house. He thinks his father was doing illegal things and he wanted to protect the family, so he pulled out the electrical cords and cut the electrical wires. He said he was doing this with a lot of energy because he was guided by God, that Mother Nature was with him, and that the birds outside were very happy because they were making a lot of noise. Dr. Thomas said Michael's delusions were mainly persecutory in nature about his father. She said his mood reflects anger and hostility. She said Michael told her he was not going to press any charges for his father's illegal acts.

Dr. Thomas did not relate any physical findings of significance except that Michael is blind in his right eye. On an emotional level, she stated that Michael gets angry very easily, but did not "act out or anything" when he became angry. She stated she had not heard of Michael threatening anyone, and in talking about his father he said, "If I want to, I can use my pen-knife, but I never use it. He is my father." Dr. Thomas gave her diagnosis as paranoid schizophrenia. Her recommendation was that he be treated with an anti-psychotic medication for at least two weeks, and be given other therapy like activity and "one-to-one interbasis" in talking to humans.

In oral argument, Michael's counsel conceded that Michael has a mental illness, but contended the standard of proof of clear, cogent and convincing evidence had not

been met to show that Michael presented a likelihood of serious physical harm to himself or to others. This standard of proof as imposed by § 202.135.5 is an intermediate standard between the preponderance of the evidence and beyond a reasonable doubt.

In *Grissum v. Reesman*, 505 S.W.2d 81, 86[1] (Mo.1974), the court considered the meaning of the phrase, "clear, cogent and convincing evidence" and stated, "As we now construe the phrase, it really means that the court should be *clearly convinced* of the affirmative of the proposition to be proved. This does not mean that there may not be contrary evidence. The word 'cogent' adds little, if anything; it means impelling, appealing to one's reason or convincing."

Another definition is found in *In Re Sedillo*, 84 N.M. 10, 498 P.2d 1353, 1355 (1972): "For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true."

The likelihood of serious physical harm to others is defined in § 202.010(11)b:

"(b) A substantial risk that physical harm will be inflicted by a person upon another, as evidenced by recent overt acts or behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm;"

The only question presented here is whether or not there was clear, cogent and convincing evidence that Michael presented a likelihood of serious physical harm to others. There is no contention that he presented any threat or harm to himself. The only evidence which may be said to satisfy the burden of proof is the statement by Mrs. O'Brien that she was scared of Michael when he took her arm to emphasize his desire for her to accompany him to the basement. Mrs. O'Brien stated she had never been scared of Michael before and at that time Michael did not threaten her or actually do any physical harm to her. The fact that Michael took his mother by the arm to cause her to accompany him to the basement does not constitute an overt act or behavior which caused harm or which could be said to have placed Mrs. O'Brien in reasonable fear of sustaining such harm, absent threats by Michael or other evidence to lead to a conclusion that Michael meant to inflict harm to his mother if she did not accompany him to the basement. This court cannot conclude that she was placed in reasonable fear of sustaining harm at that time. The sight of the basement and later the damage to Mr. O'Brien's room were, of course, upsetting, but again, there was no indication of physical harm as opposed to property damage.

The closest the evidence comes to indicating any threat of physical harm was the inference which the State seeks to draw from Michael's request for matches. However, Mrs. O'Brien was not prepared to say she thought Michael was actually going to burn the house because she made it clear she did not know what he meant by his statement that he was going to finish the job. It would be speculation at best to conclude that Michael intended to actually burn the house down and thereby cause harm to anyone.

The testimony of Dr. Thomas rebuts any idea of physical harm being done by Michael. The total lack of any history of threats or actual harm, together with his statement that he did not use his pen-knife on his father because of their relationship, rebuts any inference that Michael would do physical harm. There was nothing in Dr. Thomas's testimony which indicates any inclination on the part of Michael to do any harm to anyone.

Considering all of the evidence, this court is unable to say that it is clearly convinced that Michael presented a likelihood of serious physical harm to others, nor can this court say, under the definition in *Sedillo*, that the evidence instantly tilts the scales toward a finding of a likelihood of serious physical harm to others.

One other problem remains, that is the application of the test to be applied in a review of a court-tried case as set forth in

*Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo. banc 1976), when the standard of proof is by clear, cogent and convincing evidence. Substantial evidence as used in *Murphy* means clear, cogent and convincing when that standard of proof is applicable. Thus, if it cannot be said that the judgment in this case is supported by clear, cogent and convincing evidence, then it cannot be said the judgment is supported by substantial evidence, and under *Murphy v. Carron*, must be reversed. Because this court cannot find clear, cogent and convincing evidence that Michael presented a likelihood of serious physical harm to others, it is not supported by substantial evidence.

The judgment is reversed and Michael is ordered discharged.

SHANGLER, J., concurs.

MANFORD, J., dissents in separate dissenting opinion.

MANFORD, Judge, dissenting.

I must respectfully dissent in the instant case for I feel the record reflects sufficient evidence to satisfy the statute.

I would affirm the ruling of the Circuit Court.