**In the Interest of J.A.J., III, a/k/a J.J., Jr., a child under 17 years of age.**

Nos. 44927, 44936.

Missouri Court of Appeals,
Eastern District,
Division Three.

May 24, 1983.

H. Carl Kuelker, St. Louis, for mother-appellant.

Patrick O. Boyle, St. Louis, for father-appellant.

Patricia Wendling, Donald Becherer, Graham W. LaBeaume, Suzanne E. Rechtin, Juvenile Div., St. Louis, for respondent.

CRANDALL, Presiding Judge.

Mother and father appeal from the trial court's order terminating their parental rights in the minor child, J.A.J., III, born March 6, 1979.[1] The trial court found by clear, cogent and convincing evidence that appellants had abused M.J.D., a six year old male, and had willfully and wantonly neglected D.B., a five year old male, which resulted in D.B.'s death. D.B. and M.J.D. are siblings of J.A.J., III. See § 211.447.-2(2)(e), RSMo (1978). We affirm.

On appeal mother challenges the sufficiency of the evidence to terminate her parental rights in J.A.J., III. This contention requires a review of the evidence under the standard established by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *In re Adoption of S.*, 581 S.W.2d 113, 118 (Mo. App.1979).

Dr. John Venglarcik, a pediatrician, testified regarding the abuse of M.J.D. On February 5, 1980, he examined M.J.D. at Cardinal Glennon Hospital for burns and trauma. The child was in severe pain suffering from a bruise on his left eye, swelling and discoloration of his upper lip, bruising of the right ear, scratches on his neck, a circular burn on the middle finger of his left hand, and some tissue damage to his right hand. M.J.D. also had a small round burn on his stomach, another on his body above his penis, and additional burns on the underside of his penis extending almost to the scrotum. The burns to the penis covered 20 percent of that area. Dr. Venglarcik testified that due to the severity of M.J.D.'s injuries there was a possibility that his penis would become deformed and its functions permanently damaged. Both buttocks were also burned. Each buttock had a linear burn extending from near the anus toward each hip. The burns were approximately two to four millimeters deep and seven to ten millimeters long. Each burn increased in severity toward the center of M.J.D.'s body with the burns nearest his anus and scrotum being third degree burns and the burns nearest his hip and glans being less severe. All the burns were infected. In Dr. Venglarcik's opinion the burns on the child's genitals and buttocks were caused by a live electrical wire and had occurred between 18 to 20 hours prior to his admission to Cardinal Glennon Hospital.

The parents stated that the burns on M.J.D.'s genitals and buttocks were self-inflicted. They explained that M.J.D. was a hyperactive child often into mischief;[2] and that the night before they sought treatment for him, M.J.D. had discovered a live lamp cord and had placed it against his own body.

In Dr. Venglarcik's opinion the electrical burns were not self-inflicted. According to the doctor, for M.J.D.'s burns to appear as they did, he would have had to place the wires against himself twice, once against the front of his body and then again to the back of his body. M.J.D. would have had to plug the cord in, pull down his pants, and run the cord from his rear through his legs. When the cord came in contact with his body, it would have caused extreme pain which would have naturally caused him to scream and jump away from the source. Then M.J.D. would have had to repeat the same sequence, this time applying the live wire to the front of his body.

The parents admitted that M.J.D. was in their custody when he was burned with the

---

1. The separate appeals by the mother and father have been consolidated for the purpose of this opinion. The mother is the natural mother of D.B., now deceased, M.J.D., and J.A.J., III. The father is the stepfather of D.B. and M.J.D. and the natural father of J.A.J., III.

2. Dr. Cross, a clinical psychologist, tested M.J.D. and found him to be a normal child with no self-destructive tendencies or manifestations of hyperactivity. She further stated that she had never seen even a self-destructive child burn himself.

wire. There is no evidence that there was anyone else present when M.J.D. was burned who could have inflicted the wounds upon him. This, together with Dr. Venglarcik's testimony that the wounds were not self-inflicted, is substantial evidence that appellants either burned M.J.D. or knowingly permitted him to be burned. *See* § 211.447.2(2)(e), RSMo (1978).

The parents explained that M.J.D. had suffered the circular burns on his hand when he bumped into his father's cigarette. Dr. Venglarcik found this explanation also inconsistent with the appearance of the wound. He stated that if M.J.D. had accidentally bumped into a cigarette the burn would have been shallow forming only a blister. The burn on M.J.D.'s finger, however, was deep and heavily scabbed which indicated contact with a cigarette for at least a full second.

Appellants explained the injuries to M.J.D.'s face and head by stating he had been in a fight with another boy. Dr. Venglarcik found the parents' explanation consistent with the nature of the injuries; however, he noted that the story could not be confirmed because no one could remember the perpetrator's name, where he lived, or what school he went to, although the fight had allegedly occurred on the school bus. In conclusion, Dr. Venglarcik found, based upon a reasonable medical certainty, that M.J.D. was a victim of parental abuse because he suffered a "constellation of injuries [which were] not adequately explained by the history given."

D.B. died approximately nine months after M.J.D. was injured. At 2:50 a.m. on October 4, 1980, police officers Rask and Pfeiffer were stopped by a Ms. Smith who requested their assistance. She directed Officer Rask to the Smith home where D.B. and his parents had come for help. Officer Rask saw D.B. naked from the waist down lying on a bed. His body was gray and his extremities were cool and stiff; his eyes were half open and there was a strong odor of cologne emanating from his mouth.

D.B. was not breathing so Rask administered mouth-to-mouth resuscitation. Officer Rask believed D.B. was dead. Earl Smith, who was also present in the Smith home, corroborated Officer Rask's testimony. Mr. Smith stated that he did not see D.B. breathe and that the child's body felt cold and stiff. Approximately five minutes after Officer Rask commenced life-saving measures on D.B., an emergency medical team arrived and also began administering to him. Mark Corley, a member of the emergency medical team, began mouth-to-mouth resuscitation and chest compression on D.B. but could not find a pulse. Corley stated that D.B. appeared pale, cold and waxy to the touch; his limbs were very rigid and his face was blue. As Corley administered mouth-to-mouth resuscitation to D.B., the odor and taste of cologne were very strong. An EKG monitor was attached to D.B. The machine registered a signal but it was not normal and lasted only for 15 seconds. Corley testified that the EKG could register electric activity even after death, and that because the machine was so sensitive, even the act of administering CPR could cause the monitor to register a signal. D.B.'s condition led Corley to believe that D.B. had been in full cardiac arrest for approximately a half hour and that there was little the emergency medical team could do for him. Soon thereafter the emergency crew rushed D.B. to Cardinal Glennon Hospital but efforts to save him were not successful.

An autopsy performed on D.B. revealed bruises on his face, back, neck and right arm. D.B.'s tongue showed lacerations from having been bitten. Dr. Mary Case, a pathologist at Cardinal Glennon Hospital, testified that the cause of D.B.'s death was ingestion of cologne containing ethanol and salicylates, commonly known as aspirin. In Dr. Case's opinion the ethanol in D.B.'s system alone could possibly have killed him but the level of salicylate found in D.B.'s body was clearly lethal. She testified that D.B. would have had to ingest 52 to 105 baby aspirin[3] or 14 to 26 adult aspirin at one

---

3. Baby aspirin are packaged 36 to a bottle. Dr.

Case testified that a child cannot overdose on

time to account for the lethal levels of salicylates found in his body. She further stated that it was "very unusual" for a child of D.B.'s age to voluntarily ingest medication because children of his age are aware of the danger involved and are beyond the age of investigating things by putting them in their mouths. Dr. Case characterized D.B.'s death as homicide due to medical neglect by appellants. The doctor elaborated by explaining that the ingestion of aspirin and ethanol would not have caused a sudden death but that D.B. would have been drastically ill for "a long period of time." He would have been staggering, stumbling, falling and speaking in a slurred fashion, generally exhibiting the behavior of an intoxicated person from having ingested the ethanol. The ingestion of aspirin would have caused nausea, vomiting, abdominal pain and panting.[4] These symptoms would have exhibited themselves soon after ingestion of the intoxicants and would have continued for two to six hours. Eventually the ethanol and aspirin would have repressed D.B.'s respiratory system causing coma for several hours and then death. Dr. Case stated that the overt manifestations of D.B.'s illness would have been such that no layman or even another child could have failed to recognize its grave nature. The symptoms could not have been mistaken for those associated with flu, and neither the ingestion of the ethanol nor the aspirin would have caused D.B. to suffer from fever. Furthermore, the coma could not be mistaken for normal sleep because it would not have been possible to rouse D.B. from the coma. The doctor testified that D.B. could have been saved if he had received medical attention any time prior to death. Dr. Case placed the time of D.B.'s death at between 9 and 11 p.m. on the 3rd of October, 1980.

Appellant-father testified that he left D.B. with the child's grandmother at 9 a.m.

on October 3, 1980. D.B. was lethargic and suffering from an upset stomach and fever. Appellant-mother testified that she arrived at the grandmother's house at approximately 3 p.m. that afternoon where she stayed with D.B. until appellant-father arrived. The parents stated that at approximately 7 p.m. that evening they walked home with D.B. They noticed no strange behavior by the child other than his lethargy and upset stomach which had been treated with "Congesprin" and baby aspirin. The parents and D.B. went to bed at approximately ten o'clock that evening but D.B. arose shortly thereafter to vomit. After his visit to the lavatory D.B. slept until about 2 a.m. when he began gasping for air. Appellant-father then rushed D.B. to the Smith residence to seek help.

■ Permanent severance of the parent-child relationship is an awesome exercise of power by the State. For this reason the authority seeking termination of parental rights must prove its case by clear, cogent and convincing evidence. § 211.-447.2, RSMo (1978); *S.K.L. v. Smith,* 480 S.W.2d 119, 123 (Mo.App.1972). To meet this burden of proof, substantial evidence, that is, evidence which, if true, has probative force upon the issues, *Terminal Warehouses of St. Joseph, Inc. v. Reiners,* 371 S.W.2d 311, 317 (Mo.1963); *Smoot v. Marks,* 564 S.W.2d 231, 236 n. 7 (Mo.App.1978), must be adduced to make a submissible case. It is then for the trier of fact to decide whether the evidence is credible, even in view of contrary evidence, and whether the moving party has met its burden. Clear, cogent and convincing evidence is that which "instantly tilt[s] the scales in the affirmative when weighed against evidence in opposition"; evidence which clearly convinces the fact finder of the truth of the proposition to be proved. In the *Matter of O'Brien,* 600 S.W.2d 695, 697 (Mo.App. 1980). We conclude from our review of the

36 baby aspirin.

4. Dr. Case testified that a normal person takes 25 breaths per minute, and a person in D.B.'s condition would have been taking 90 breaths per minute, literally panting "like a dog." The

doctor stated that the high level of acetone found in D.B.'s system was symptomatic of metabolic acidosis which causes this panting behavior, and that D.B. had been panting heavily for several hours prior to lapsing into coma.

record that substantial evidence was presented to the trial judge sufficient to meet the required burden.

Although there was no evidence of any direct physical or emotional harm to J.A.J., III, to require this child to suffer the fate of his siblings prior to termination of parental rights would be a tragic misapplication of the law. Proof of either parental abuse of M.J.D. or the medical neglect of D.B. resulting in his death, is sufficient to terminate the parental rights of the parties in J.A.J., III. § 211.447.2(2)(e), RSMo (1978); *In the Interest of A.K.S. & S.L.H. v. Smith,* 602 S.W.2d 848, 851 (Mo.App.1980). The mother's challenge to the sufficiency of the evidence is denied.

▆▆ The father contends that the admission of hearsay statements made by M.J.D. and the admission in evidence of the social investigation report was erroneous. "In a court tried case ... 'it is practically impossible to predicate reversible error on the erroneous admission of evidence ....'" *In re Adoption of S.,* 581 S.W.2d at 118. The party making the contention must demonstrate the absence of sufficient competent evidence to support the trial court's order. *Id.* at 118. The father does not claim there was insufficient competent evidence to support the order. In reviewing the evidence earlier in this opinion we did not consider either the report or M.J.D.'s statements. Even in their absence there remained overwhelming evidence of the abuse of M.J.D. and neglect of D.B. by appellants. Thus even if the challenged evidence was improperly admitted, the father by not directly contesting the sufficiency of the evidence to terminate his parental rights, has failed to show that he was prejudiced. *See J.A.A. v. A.D.A.,* 581 S.W.2d 889, 895 (Mo.App.1979). The father's contentions are denied.

The trial court's order terminating appellants' parental rights in J.A.J., III, is affirmed.

REINHARD and CRIST, JJ., concur.