**In the Interest of C.L.S., Respondent,**

v.

**C.L.S., Appellant.**

**No. 50767.**

Missouri Court of Appeals,
Eastern District,
Southern Division.

Dec. 23, 1986.

Diane Campbell Howard, Cape Girardeau, for appellant.

Kevin Blair Spaeth, Cape Girardeau, for respondent.

Sandra A. Mears, Cape Girardeau, guardian ad litem for child.

DOWD, Judge.

Natural mother, C.L.S., appeals from an order terminating her parental rights in the minor female child, C.L.S., (hereinafter C.) based upon a finding that appellant knowingly permitted acts of sexual molestation against C.[1]

Testimony at the hearing revealed the following. Appellant gave birth to C. on December 1, 1982 in Rockford, Illinois. A deaf mute since birth, appellant had attended the School for the Deaf in Jacksonville, Illinois and upon graduation moved to Rockford. Reports indicate that she was unable to maintain employment and consistently depended upon her sister and others. Appellant was unmarried at the time of the hearing and had never been married to C.'s father.

In November of 1984 appellant moved to Cape Girardeau, Missouri at the encouragement of her friends, Mike and Mary[2] and in expectation of marriage to a mutual friend. The marriage did not take place and appellant and C. resided with Mike and Mary, who are also deaf. Appellant received public aid for both herself and C.

On November 11, 1984 appellant took C. to a local pediatrician, Dr. James Hoffman, who conducted a thorough physical examination of C. Dr. Hoffman was concerned about C.'s speech and motor development and referred her to Sue Austin, a speech therapist at a local hospital. Ms. Austin determined that C.'s speech development was delayed and recommended that the Division of Family Services (DFS) open a safekeeping case on her.[3] A DFS worker suggested a plan to send C. to a Montessori school (paid for by DFS) in order to improve C.'s speech and motor skills. Appellant declined to send C. to the school claiming the five-block walk was too strenuous for appellant because of a heart ailment. C. was then referred to the Cerebral Palsy Center (CPC) which could be accessed by bus.

On March 5, 1985 an employee of CPC, while changing C.'s diaper, noticed several bruises and abrasions about C.'s thighs, genitals, and anus. She reported this to her supervisor who, despite concern, returned C. to her home. The supervisor had intended to speak with appellant about C.'s injuries but when she arrived at the home only Mike was there. She decided to leave C. with Mike and return the next day to speak with appellant. The supervisor testified C. appeared frightened and began to cry when left with Mike. Alarmed by this, the supervisor decided later that day it had been unwise to leave C. with Mike and she called the child abuse hotline. A DFS worker was sent immediately to C.'s home to investigate.

By the time the DFS worker arrived at the home appellant had returned and both she and C. were taken to Dr. Hoffman's office where an examination was made and photographs were taken. Dr. Hoffman gave the following testimony regarding C.'s injuries. There were bruises on the

1. The father's rights were also terminated. He had no contact with C., did not contribute to her support, did not appear at the hearing, and does not contest the order of termination.

2. Surnames are omitted.

3. A family counselor testified C.'s deficiencies were the result of her environment rather than a learning disability and that she improved significantly while in foster care.

left side of C.'s face. There was a contusion in the left chest area which was the result of a bite mark. There were extensive bruises in various stages of healing in both the left and right groin areas. There were also extensive bruises in the inguinal area which is slightly above the groin. There were bruises in the sacral area which is the area at the tip of the tailbone and the beginning of the buttocks. There were also contusions and abrasions in the sacral and anal areas. The area around the anus was irritated. There was an extensive bruise near the labium majora (the vaginal covering) as well as vaginal irritation. The vagina was also very red which is suggestive of chronic irritation. Her vaginal opening was much larger than expected for a two-year-old girl and her hymen was not intact. Dr. Hoffman stated "something was placed or was attempted to be placed [in her vagina] over periods of time." Also, her rectal tone was decreased which is suggestive of acts of sodomy. Dr. Hoffman also stated C.'s injuries were inflicted from several days to two weeks prior and that the injuries did not occur all at one time. From these injuries Dr. Hoffman concluded that C. had been sexually abused and most likely, repeatedly. The photographs taken at Dr. Hoffman's office were received into evidence and submitted as exhibits to this court. They graphically depict the abuse inflicted upon C. and are consistent with Dr. Hoffman's testimony.

After Dr. Hoffman completed his examination, appellant and C. were taken back to their home and DFS took custody of C. She was placed in foster care and weekly visits were arranged for appellant. On March 27, 1985, C.'s case was staffed with the Child Protection Team (CPT) which recommended foster care until more information could be obtained regarding appellant. CPT further recommended that appellant's parental rights be terminated if she failed

to cooperate with the social services agencies and police authorities.[4] In May, joint sessions at the Family Learning Center (FLC) were arranged for appellant to teach her how to properly care for and protect C.

Appellant attended only eleven of the twenty-six scheduled visits arranged by DFS. She failed to appear the entire month of April and contacted no one at DFS regarding her whereabouts. Similarly, she attended only five of the FLC sessions and they were eventually discontinued.

DFS then recommended termination due to appellant's lack of cooperation, the nature of the injuries, and an opinion that appellant would be unable to protect C. in the future. On May 21, 1985 a petition was filed by the Juvenile Office to terminate appellant's parental rights. Counsel was appointed for appellant and a *guardian ad litem* was appointed for C. A hearing was held on August 21, 1985 and an interpreter was certified and present at all times during the hearing to sign for appellant. At the conclusion of the hearing the *guardian ad litem* recommended termination and an order was entered terminating appellant's parental rights pursuant to § 211.447.-2(2)(c), RSMo Cum.Supp.1984, and § 211.-477.1, RSMo 1978.[5]

Section 211.447.2(2)(c) provides:

The juvenile court may, upon a petition filed by the juvenile officer under this section, terminate the rights of parent to a child if it finds that such termination is in the best interest of the child and one or more of the following conditions are found to exist: ... (2) When it appears by clear, cogent and convincing evidence that one or more of the following conditions exist: ... (c) The parent has committed, or knowingly permitted, an act of incest with the child, or other sexual molestation of the child. ...

Section 211.477.1 provides:

4. Although there were several suspects, including Mike, no one was ever arrested in connection with this case.

5. All further references to § 211.447 are RSMo Cum Supp.1984 and all further references to

§ 211.477 are RSMo 1978. Also, the recently enacted versions of §§ 211.447 and 211.477 apply to proceedings commenced on or after Sept. 28, 1985. § 211.487, RSMo Supp.1985.

If after hearing the court finds that one or more of the conditions set out in section 211.447 exist and the termination of the parental rights of the parent in and to the child is in the best interests of the child, it may terminate all rights of the parent with reference to the child.

In ordering termination, the circuit court found appellant had legal and physical custody of C. at the time the molestation occurred, appellant knowingly permitted it to happen, and appellant should have protected C. The court further found appellant either cooperated in the abuse or chose to ignore it until it was discovered at CPC and this failure to cooperate continued even after appellant was faced with the prospect of having her parental rights in C. terminated.

Appeal is taken from this order.

Appellant contends: (1) The trial court erred in terminating appellant's parental rights in that she was not provided a proper hearing because her deafness prevented her from adequately comprehending or participating in the August 21, 1985 hearing; and (2) There was not clear and convincing evidence that appellant failed to protect her daughter from sexual abuse.

Regarding appellant's first point, that she did not receive a proper hearing, we note at the outset that appellant's only citations of authority are statutory references to §§ 211.447 and 211.477. It is undisputed that a hearing is required before parental rights can be terminated. Appellant fails, however, to offer any authority for her contention that her deafness prevented her from receiving the requisite hearing.

The special problem created by appellant's deafness is that of the obvious impact on her ability to communicate. Appellant was, however, educated at a school for the deaf and is proficient in signing the old sign. An interpreter was provided at trial and appellant failed to object at the hearing when the interpreter was sworn and certified.

■ Claims of error in civil appeals will not be considered unless first presented to and decided by the trial court. *Niederkorn v. Niederkorn,* 616 S.W.2d 529, 535 (Mo. App.1981). In not objecting, appellant failed to preserve this allegation of error and any review accorded by this court would be for plain error. Rule 84.13.

The rule will not be invoked to excuse failure to properly object. *In Interest of Kevin,* 685 S.W.2d 938, 942 (Mo.App.1985). "The requisite prelude to plain error review occurs where the circumstances are characterized as having engendered hatred, passion or prejudice resulting in manifest injustice or miscarriage of justice." *Anderson v. Burlington Northern R. Co.,* 700 S.W.2d 469, 474 (Mo.App.1985).

■ The circumstances here do not suggest such a manifest injustice. The interpreter, Sandra Knight, testified that she has been signing in the old sign for 33 years and that both of her parents are deaf. When she was sworn and certified, she stated she was able to make herself understood and known to appellant and that they understood each other's signing. Appellant stated she had no objections and the court certified Ms. Knight.

The court made a considerable effort throughout the hearing to make sure appellant understood the testimony as it was being presented. During Dr. Hoffman's testimony the court specifically asked the appellant if she understood the testimony and she replied that she did. Several times the court slowed the proceedings in order to be sure the interpreter could relay all of the testimony to the appellant. The court also encouraged Ms. Knight to notify the court if she was unable to keep up with the testimony. At the close of the Juvenile Office's case, appellant was asked whether she understood the proceedings thus far or whether she needed clarification from any witness. Appellant's attorney stated "[s]he's indicated she has understood everything that's gone on thus far." Although there were some problems when appellant testified, the court tried to help

appellant by rephrasing and simplifying the questions.

A review of the record reveals a considerable effort to compensate for appellant's deafness. Ms. Knight's competency was not challenged during the hearing nor did there appear to be any dissatisfaction on appellant's part. These circumstances suggest little, if any, prejudice and thus appellant has failed to show a miscarriage of justice sufficient to invoke plain error review. Point denied.

Appellant's second point, that there was not clear and convincing evidence that she failed to protect her daughter from sexual abuse, challenges the sufficiency of the evidence. "The question as to the sufficiency of the evidence to support a judgment in a court-tried case may be raised on appeal, whether or not the question was raised in the trial court." *Villaume v. Villaume*, 564 S.W.2d 290, 297 (Mo.App. 1978).

In a termination proceeding the trial judge must first decide that there is clear, cogent, and convincing evidence that one of the statutory conditions exists and secondly, must determine that termination is in the best interest of the child, allowing a preference toward leaving the child with the natural parent. *D.G.N. v. S.M.*, 691 S.W.2d 909, 912 (Mo. banc 1985).

> The general rule that natural parents have a primary right to the custody of their children is controlling when it is consistent with the welfare of these children. This is so because the rule favoring natural parents stems from the presumption that maintaining the natural parent-child relationship is best for the child. When in conflict, however, the rule favoring parental custody is superseded by the concerns of the state for the child's welfare.

*In Interest of C.L.M.*, 625 S.W.2d 613, 617 (Mo. banc 1981).

This court recognizes that the termination of parental rights permanently severs the parent-child relationship and that this power must be exercised carefully and diligently on the basis of clear, cogent, and convincing evidence. *In Interest of J.A.J.*, 652 S.W.2d 745, 748 (Mo.App.1983). However, the juvenile court is not constrained to "stand idly by in the face of a situation recognized as potentially harmful to the well-being of a child and await the child's emotional destruction before attempting to protect the child from an injurious and harmful environment potentially destructive of the child's emotional health." *L. v. Jackson County Juvenile Court*, 544 S.W.2d 330, 333 (Mo.App.1976). This regard for the child's best interest is always the primary concern in a termination proceeding. *P.A.W. v. A.M.W.*, 716 S.W.2d 284, 288 (Mo.App.1986).

Our review of termination proceedings is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The trial court determination will be sustained unless there is no substantial evidence to support it, unless it is contrary to the weight of the evidence, or unless it erroneously declares or applies the law. *In Interest of S.D.W.*, 702 S.W.2d 527, 529 (Mo.App.1985); *Murphy, supra*, at 32. Due regard is given for the trial court's opportunity to view and judge the credibility of the witnesses. *Juv. Office of Cape Girardeau Cty. v. M.E.J.*, 666 S.W.2d 957, 960 (Mo.App.1984).

For the court to make a finding of termination, the Juvenile Office must prove its case by clear, cogent, and convincing evidence. *In Interest of J.A.J., supra.* Such evidence was initially defined as evidence which " 'instantly tilt[s] the scales in the affirmative when weighed against evidence in opposition;' evidence which clearly convinces the fact finder of the truth of the proposition to be proved." *In Interest of J.A.J., supra* (quoting *Matter of O'Brien*, 600 S.W.2d 695, 697 (Mo.App.1980)). The first part of this definition was rejected, however, in the recent case *In Re J.D.K.* when "clear, cogent, and convincing" was held to mean " 'the court should be clearly convinced of the affirmative of the proposition to be proved.' " *In Re J.D.K.*, 685 S.W.2d 876, 880 (Mo.App.1984) (quoting *Grissum v. Reesman*, 505 S.W.2d 81, 86 (Mo.1974)). The court rejected the conten-

tion that there must be an "instant tilt" and found clear, cogent, and convincing evidence where the record, as a whole, demonstrates a continuing inability by the parent to care for the child. Thus, the burden of proof is such that the fact finder be clearly convinced of the proposition.

The trial court found that the standard of clear, cogent, and convincing evidence was met by the Juvenile Office in establishing that appellant "knowingly permitted" an act of molestation against her daughter.[6]

Appellant contends there was no evidence presented that she knowingly permitted the molestation to occur. Appellant concedes that C. was sexually molested and that C. was in appellant's custody at the time of molestation but contends there was no evidence that she was aware of the sexual molestation or that she knowingly permitted it.

The interpretation of the statutory term "knowingly permitted" was recently addressed in *In Interest of P.E.B.*, 708 S.W.2d 315 (Mo.App.1986).[7]

In response to a contention that "knowingly permit" means to give express approval, the court held "[i]t is not necessary to fully express that meaning. As so used those terms embrace a knowing exposure of a child to reasonably anticipated abuse or a failure to protect a child from such abuse." *In Interest of P.E.B., supra* at 319. "Furthermore, children are owed a duty to be protected and to have their abuser reported." *In The Interest of A.M.K.*, 723 S.W.2d 50, 53 (E.D.Mo.1986).

■ The record in this case contains substantial evidence to support the trial court determination that appellant did "knowingly permit" the sexual molestation of C. The child's injuries were so severe and so extensive that it is incredible to suggest they might not be noticed. The entire groin area was bruised and there were contusions and abrasions around the vagina and anus. All of these injuries were clearly visible once the diaper was removed. Dr. Hoffman testified there may even have been some minor bleeding from the rectal area. He further testified the injuries were in various stages of healing and that C. was probably molested repeatedly. Appellant took C. to Dr. Hoffman's office for an ear check the day before the hotline report was made. She did not tell Dr. Hoffman that C. was injured and did not seek any other treatment for C.'s injuries. Dr. Hoffman testified the molestation occurred from several days to two weeks prior to the hotline report of March 5 and that the injuries would have been present when C. was brought to his office for the ear check.

The evidence further shows appellant knew C. was afraid of Mike but she continued to leave C. alone with him. She stated she thought Mike was "dirty" but that Mary insisted she leave C. with him so she did, despite the fact that C. cried whenever she was left with Mike. C. did not exhibit the same fear toward her mother's other male friend and appellant should have responded to the child's fear. Had it not been for the CPC hotline report, C. may have had to endure the repeated molestations to the point where her physical and emotional health were in even more serious jeopardy.

Furthermore, appellant made very little effort to learn how to care properly for C. The FLC sessions were discontinued twice because appellant did not attend and she failed to notify anyone of her whereabouts or why she missed the sessions. She was equally irresponsible about the visits arranged by DFS. The FLC counselor testi-

6. The court also found that termination is in the child's best interest and appellant has not specifically contested that finding. The resolution of the sexual molestation issue, however, obviously bears upon a finding of what is in the child's best interest.

7. The statutory section addressed was § 211.-447.2(2)(d).

fied appellant did not respond to attempts to make her understand that she was responsible for C.'s safety. Appellant was aware her parental rights might be terminated and she still failed to respond to C.'s needs. The FLC counselor testified the appellant's interaction with C. was childish and that she "focus[ed] on her own needs more than on her child's needs."

There was also testimony appellant did not cooperate with the police. The police detective assigned to the case testified she felt appellant was hiding information and had not been cooperative. The DFS worker also testified appellant had not been cooperative.

Appellant's lack of ability and initiative to protect C. from physical abuse also subjected C. to severe emotional trauma. The FLC counselor testified that C. may react in one of two ways. She stated "if it happens over a long period of time, it will encourage the child to be promiscuous and actually to seek out sexual activities with people. Otherwise it could cause her to become extremely fearful of males or strangers, any care giver because the man was supposedly a care giver." Testimony revealed that C. is already very reserved and not open to any kind of normal affection. Without treatment it appears unlikely that C. will be able to develop normal, healthy relationships. The FLC sessions were geared toward helping C. acknowledge and recover from the trauma but, due to appellant's lack of participation, the joint sessions were discontinued.

Based on the foregoing, we find there is sufficient evidence to sustain the trial court determination and that the standard of clear, cogent, and convincing evidence was properly applied. There is evidence appellant failed to protect C., failed to report the abuser, and knowingly exposed the child to a reasonably anticipated abuse. We, therefore, affirm the judgment of the trial court.

SMITH, P.J., and REINHARD, J., concur.