361 S.W.3d 444 (2012)
In the Interest of I.R.S., B.S., and C.T.S.
J.L.T., Appellant,
v.
Greene County Juvenile Office, Respondent.
Nos. SD 31312, SD 31313, SD 31314.
Missouri Court of Appeals, Southern District, Division Two.
January 25, 2012.
Motion for Rehearing and Transfer Denied February 17, 2012.
Application for Transfer Denied April 3, 2012.
*445 James R. Sharp, Springfield, MO, for Appellant.
William Prince, Springfield, MO, for Respondent.
DANIEL E. SCOTT, Judge.
J.L.T. ("Mother"), whose three children were alleged and found to be in need of care and treatment, challenges juvenile court judgments assuming § 211.031.1(1) jurisdiction.[1] Mother claims the judgments are not supported by substantial evidence and that her counsel was ineffective. We affirm the judgments and remand these cases to the juvenile court for further proceedings.

Background
We view the facts, including Mother's extensive history with the child-welfare system, and their reasonable inferences in the light most favorable to the judgments (In the Interest of F.M., 979 S.W.2d 944, 946 (Mo.App.1998)) and summarize the background accordingly.
Mother lost her parental rights to two children (not the subject of these cases) in Ohio in 2005. I.R.S., who was born the following year, was under juvenile court jurisdiction from August 2006 to May 2007 due to parental neglect. B.S., born in May 2007, and I.R.S. were under juvenile court jurisdiction from June 2007 to November 2008 due to parental neglect. Mother's 18 referrals to the Missouri Children's Division ("CD") resulted in five investigations *446 and eight informal services cases, the latest of which was closed at Mother's request in September 2010. Still, Mother's caseworker remained concerned about the children and Mother's parenting abilities. Services had not improved Mother's poor interaction with the children, nor remedied her belligerence or tendency to use services only as a means for transportation around Springfield.
Mother's history of poor anger management and mental instability is ongoing. Such mental instability was, in part, why I.R.S. was placed in care in 2006. In 2007, shortly after taking the children into care, the court appointed a guardian ad litem for Mother. Later that year, a counselor noted Mother's unstable moods and symptoms of bipolar disorder. The family was offered informal services in 2010 due in part to concerns about Mother's mental instability. In November 2010, I.R.S.'s daycare reported difficulties working with Mother, who would get mad and hang up the telephone one day, then call a few days later and act as if nothing had happened. Mother tried counseling, but did not follow through with the counselor's recommendations. She has not sought out medication therapy despite strong professional advice in 2007 to do so.
Mother had limited prenatal care while pregnant with her youngest child, C.T.S. She once called her doctor for pain medication, which was prescribed, but Mother would not take it because it was not the specific drug she wanted.
Mother and G.S. ("Father")[2] have a history of domestic strife. I.R.S. told her preschool teacher and a CD investigator that Mother calls Father "evil." I.R.S. dreams that Father will kill I.R.S., B.S., and Mother. In an April 2010 incident, Mother called Father at work and asked him to come home. When he arrived, Mother yelled at him, put the children outside, and locked the door. Father took the children to a restaurant. Mother called the police and reported that Father had abducted the children.
In June 2010, Father left the house because Mother was yelling at him as usual. Mother then called Father so many times that he turned off his cell phone. The next day, Motherwho was pregnant and driving with a revoked license with I.R.S. and B.S. as passengerssaw Father driving a truck. She chased him in her car, rammed into the truck, and blocked its path. She exited her car, started throwing items out of the truck bed, and did not calm down even after police arrived. Her complaint was that Father did not clean house or help care for the children.
In November 2010, 32 weeks into her pregnancy with C.T.S., Mother was transported to the hospital by ambulance due to bleeding, pain, and placental abruption. Within a few hours of arrival, she was complaining about not getting the pain medication she requested and of needing a cigarette. She wanted her intravenous lines disconnected and threatened, against medical advice, to leave the hospital. She argued with Father and hospital security had to be called to separate them.
After she delivered C.T.S., Mother acted erratically and hysterically. She refused to take prescribed medications and again threatened to leave the hospital because she was not getting her painkiller of choice. A psychiatric consultation was ordered, during which Mother exhibited anxiety and symptoms consistent with bipolar *447 disorder or Axis II[3] pathology. Mother adamantly refused psychiatric assistance or to speak to a social worker, and continued to argue with Father while in the hospital.
Although Mother tried to brush them aside, a CD investigator and a deputy juvenile officer conducted a newborn crisis assessment at the hospital. Mother reported that she hated Father, that he had not lived with her during the pregnancy, and that she terminated informal services because they would not give her rides or watch the children for her.
Juvenile authorities took protective custody of the children. Mother became irate, complaining of prior grievances against the system, then said she loved Father and that they were working things out as a couple.
The juvenile office filed petitions alleging that the children needed care and treatment due in part to Mother's mental health, anger management issues, and failure to seek appropriate prenatal care; her history of domestic disturbances with Father; and the family's history of involvement with the child-welfare system. Mother appeared with her attorney at the protective custody hearing and met with her attorney at the attorney's office. She also was present with her attorney (and Father and his attorney) at a combined adjudication and disposition hearing on December 3, 2010. At that hearing, the juvenile office offered exhibits per stipulation of the parties, no party called witnesses, and no evidence was submitted on Mother's behalf. The court found that the children were subject to its jurisdiction, entered judgments to that effect, and ordered a written treatment plan. No objection was raised to the evidence presented, to the court's jurisdiction over the children, or to the outcome of that hearing.
Several months later, Mother claimed the court should not have taken jurisdiction and complained about her attorney. The court allowed Mother's attorney to withdraw and appointed substitute counsel. This court allowed Mother to file late appeals from the December 3 judgments[4] and later consolidated those appeals.

Principles of Review
We must affirm these judgments unless they are not supported by substantial evidence, are against the weight of the evidence, or they erroneously declare or apply the law. F.M., 979 S.W.2d at 946. As already noted, we view the evidence and reasonable inferences in the light most favorable to the judgments. Id.; In the Interest of D.A.H., 921 S.W.2d 618, 621 (Mo.App.1996).[5]

Sufficiency of Evidence
Simply put, Mother's claims of insufficient evidence fail because she disregards our principles of review. She seeks to draw inferences supporting her view of the case, but minimizes, overlooks, or ignores other inferencesand more importantly, evidencedescribed above which *448 support the court's exercise of § 211.031.1(1) jurisdiction. Point denied.

Ineffective Assistance of Counsel (IAC)
Mother claims she was denied a meaningful hearing due to IAC, specifically citing the hearing's brevity; counsel's failure to object to and stipulation regarding the juvenile office exhibits; and that counsel did not argue that there was insufficient evidence for the juvenile court to assume jurisdiction.
Per Rules 115.01 and 115.03, parents are entitled to legal representation and may qualify for appointed counsel in § 211.031.1(1) proceedings. We will assume for purposes of this opinion that, as in cases terminating parental rights, this implies a right to effective assistance of counsel. See, e.g., C.V.E. v. Greene Co. Juvenile Office, 330 S.W.3d 560, 574 (Mo. App.2010).[6] Therefore, we will review the record to determine if counsel deprived Mother of a meaningful hearing. Id.; F.M., 979 S.W.2d at 947.[7] Inherent in this test is that prejudice be proven. Id. Mother must demonstrate that different actions by counsel would have resulted in a different outcome. C.V.E., 330 S.W.3d at 575.[8]
As explained below, Mother has not met her duty as appellant to convince us that counsel's cited actions deprived her of a meaningful hearing.

Hearing Length
Mother hardly develops her complaint that the hearing was short. Due process is flexible and depends on the *449 particular situation. State ex rel. Nixon v. Peterson, 253 S.W.3d 77, 82 (Mo. banc 2008). Mother's point alleges no restriction on her right or ability to offer evidence, to present her case, etc., and cites no proof that she wanted to offer.

Stipulation and Failure to Object
We quote the record as to these claims, omitting for brevity's sake counsel's descriptions of the individual exhibits:
MR. PRINCE: Judge, with regard to jurisdiction, we have ... [description of Exhibits 1 through 9 omitted].
So we'd offer Exhibits 1 through 9, understanding that these officers would testify consistently with what's contained in their reports, but no admissions are being made by the parents as to the truth of what that testimony would be.
THE COURT: With that, Ms. Long, any objection?
MS. LONG: With that stipulation, no objection, Your Honor.
In PCR cases, we treat stipulations as trial strategy matters which, like failures to object to evidence, rarely support a PCR claim. State v. Holloway, 877 S.W.2d 692, 697 (Mo.App.1994). This situation is no different, especially in context. Mother asserts no substantive objection to these exhibits' content, does not argue that live witnesses would not have so testified, and cites no need or desire to cross-examine. Most, if not all, of these exhibits' content would have been admissible even if counsel had been more adversarial in demanding live testimony. Finally, even assuming arguendo that some content was inadmissible:
"[i]t is nearly impossible in a court-tried case to predicate reversal on the erroneous admission of evidence." In Interest of T.B., 963 S.W.2d 252, 257 (Mo.App. 1997); In Interest of J.A.J., 652 S.W.2d 745, 749 (Mo.App.1983). "Deference is given to the judge's ability to consider that evidence which is relevant and admissible." In Interest of T.B., 963 S.W.2d at 257 (quoting In Interest of C.M.W., 813 S.W.2d 331, 335 (Mo.App. 1991)). "`Trial judges are perfectly capable of receiving some evidence for one purpose and not another.'" In Interest of J.A.R., 968 S.W.2d 748, 751 (Mo.App.1998)(quoting In re S.P.W., 707 S.W.2d 814, 820 (Mo.App.1986)). On appeal, this Court presumes "`the trial judge, as the trier of fact, was not prejudiced by any inadmissible evidence and was not influenced by such evidence in reaching his decision.'" Id. (quoting State v. Clay, 909 S.W.2d 711, 716 (Mo. App.1995)).
In re S.T.W., 39 S.W.3d 517, 518 (Mo.App. 2000).

Failure to Argue Insufficiency of Evidence
Although Mother faults counsel for not arguing insufficiency of the evidence, we have already seen that sufficient evidence supports the judgments. "Counsel cannot be ineffective for failing to raise non-meritorious claims" in a PCR case[9] and the same is true here.
Based on the record, therefore, Mother's IAC complaints fail individually and in combination. Nonetheless, we address Mother's reference to In the Interest of J.C., Jr., 781 S.W.2d 226 (Mo.App.1989), a rare case where IAC was found to have deprived parents of a meaningful TPR hearing. The comparison fails for several reasons. A key difference, which alone sufficiently distinguishes J.C., was that those parents' counsel successfully argued *450 to keep the parents out of the courtroom, despite their presence at the courthouse.[10]Id. at 228. Also, evidence against the parents was subject to "many objections," none of which were made, and counsel "called no witnesses despite the fact that there were two witnesses there on the parties' behalf that expected to testify." Id.
Besides these obvious differences, the issues and rights at stake at a TPR hearing and a jurisdictional hearing are not identical. Thus, effective representation and strategy at these two different stages may not look identical either. The J.C. judgment would have permanently severed a parent-child relationship; not so with the judgment in this case. Review hearings must be held, at which the court considers whether the children can return home, and if not, what efforts have been made and what services are required to reunify the family. Rules 124.07, 124.08. The ongoing nature of an abuse/neglect case and the focus on reunification (if possible) means, hypothetically, that reasonable trial strategy could be not to deny serious issues, but to highlight parental efforts and progress toward improvement, focus on remedial services that have been or will be implemented to such end, etc.

Conclusion
We are not firmly convinced that the trial court was wrong. The record does not show IAC, prejudice,[11] or that Mother did not receive a meaningful hearing. The judgments are supported by substantial evidence. Therefore, we affirm the judgments and remand these cases to the trial court for further proceedings.
FRANCIS, P.J., and BARNEY, J., concur.
NOTES
[1] Juvenile courts have § 211.031.1(1) jurisdiction in proceedings where a minor child allegedly needs care and treatment due, inter alia, to parental neglect or if the child is otherwise without proper care, custody, or support. Statutory citations herein are to RSMo Cum. Supp.2010 and rule references are to Missouri Court Rules (2010).
[2] G.S. is the biological father of B.S. and C.T.S., and is listed as father on I.R.S.'s birth certificate. He has filed a separate appeal.
[3] Defined and described at greater length in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed.1994).
[4] Such judgments are appealable despite their lack of finality in the customary sense (i.e., disposing of all issues in the case, leaving nothing for future determination). See In re N.B., 64 S.W.3d 907, 913 (Mo.App.2002); In re C.A.D., 995 S.W.2d 21, 25-28 (Mo.App. 1999).
[5] This includes evidence, arguably otherwise inadmissible, which was admitted without objection. In re Adoption of C.M.B.R., 332 S.W.3d 793, 815 (Mo. banc 2011).
[6] The child-welfare IAC cases cited by the parties, like nearly all those we found in our nationwide research, were TPR appeals. IAC allegations at earlier stages are exceedingly rare and tend to be rejected summarily. See, e.g., In re Ashley L.C., 68 A.D.3d 1742, 890 N.Y.S.2d 863 (2009) ("[F]ather contends on appeal that he received ineffective assistance of counsel. That contention lacks merit, because the record before us in fact establishes that he received meaningful representation."). There may be several reasons for this, even when, as here, the complained-of attorney has withdrawn and new counsel could quickly raise IAC issues in the trial court. For one thing, it may be difficult to evaluate effective representation or case strategy this early, or to fairly judge particular acts in a vacuum (compare the common practice of waiving preliminary hearings in criminal cases). For another, the record may reflect counsel's action or inaction, but not the reason for it. See Massaro v. U.S., 538 U.S. 500, 505, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003). For a third, without further factual development, it may be impossible to tell if an alleged error was prejudicial. Id. For example, is it prejudicial not to object to evidence if, hypothetically, no valid objection exists? Is it prejudicial to stipulate to a report's admission if, hypothetically, a persuasive adverse witness is the alternative? Is it prejudicial not to argue if, hypothetically, one's opponent has stronger arguments and gets the last word? Is it prejudicial to have a short hearing and take a low-key approach if, hypothetically, one's client is unpredictable?
[7] In contrast to post-conviction (PCR) practice, Missouri has no established framework for IAC hearings in this context. F.M., 979 S.W.2d at 947. It has not yet been necessary to determine how to resolve IAC factual disputes in these cases. C.M.B.R., 332 S.W.3d at 820 n. 22. Most states proceed similarly, based on our research, and the approach works in this case and apparently in most others. We acknowledge, however, that when IAC claims are brought on direct appeal, generally "appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim." Massaro, 538 U.S. at 504-05, 123 S.Ct. 1690.
[8] We do not look outside the record to evaluate effectiveness of counsel or consider proffered evidence which was not presented to and believed by a factfinder. C.M.B.R., 332 S.W.3d at 814, 820 n. 22. To her credit, Mother largely toes this line in her briefs and arguments; her slight deviations are simply ignored.
[9] Smulls v. State, 71 S.W.3d 138, 157 (Mo. banc 2002).
[10] Missouri courts take seriously a parent's right to be present during a child-welfare hearing involving the parent's child. See Rule 124.03 (parents "shall have the right to be present at all times during any hearing").
[11] The trial court observed at the hearing that "this is about as weird as they come, franklyand I see a lot of strange stuff," and with reference to Mother's truck-ramming incident, that "generally, these are the kind of cases where somebody ends up in the morgue and somebody ends up in the penitentiary."