IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 11, 2004 Session

## IN RE: R.C.P.

**Appeal from the Juvenile Court for Coffee County**
**No. 313-02J      Timothy R. Brock, Judge**

**No. M2003-01143-COA-R3-PT - Filed July 13, 2004**

This appeal involves the termination of a mother's parental rights with regard to her ten-year-old daughter. The Department of Children's Services obtained custody of the child after discovering that she had been sexually abused by her mother's boyfriend. Approximately three months later, the Department and the child's guardian ad litem filed separate petitions in the Juvenile Court for Coffee County to terminate the mother's parental rights based on abandonment under Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2003) and severe child abuse under Tenn. Code Ann. § 36-1-113(g)(4). Following a bench trial, the juvenile court determined that the Department and guardian ad litem had failed to present clear and convincing evidence of abandonment but concluded that the mother had committed severe child abuse by knowingly failing to protect her daughter from her boyfriend. The mother has perfected this appeal. We have determined that the record contains clear and convincing evidence supporting the juvenile court's conclusion that the mother knowingly failed to protect her child from her boyfriend's sexual abuse and that terminating the mother's parental rights is in the child's best interests.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J., joined. WILLIAM B. CAIN, J., filed a separate concurring opinion.

Christina B. Jackson, Murfreesboro, Tennessee, for the appellant, M.A.F.

Paul G. Summers, Attorney General and Reporter, and Douglas Earl Dimond, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

M.A.F. gave birth to her daughter, R.C.P., on December 26, 1993. She was barely eighteen years old and was married to L.B.P. M.A.F.'s relationship with L.B.P., which was apparently abusive, ended in 1999 when L.B.P. died. M.A.F. and her daughter moved to McMinnville to live with M.A.F.'s parents. She obtained a two-year college degree and found a job as a laboratory technician at an area hospital.

Sometime in 1999, M.A.F. renewed her acquaintance with B.J. whom she had met casually several years earlier through a mutual friend. B.J. operated an automobile repair garage and hunting supply store in Manchester. In April 2000, after dating B.J. for approximately one year, M.A.F. and R.C.P. moved into his residence which was part of his garage and hunting supply store. This decision soon proved to be a hellish mistake. Both M.A.F. and R.C.P. paid the price for the next two years.

Within weeks after M.A.F. and R.C.P. moved in with B.J., he proved himself to be a violent, physical abuser and sexual predator. It also became apparent that he was a binge drinker and that he was becoming increasingly addicted to methamphetamine. He severely beat M.A.F. on a regular basis. On these occasions, M.A.F. would tell R.C.P. to leave the room, but B.J. forced the little girl to remain in the room to watch him beat her mother.

B.J. never physically abused R.C.P., but he did far worse while M.A.F. was at work. On at least four occasions, B.J. had oral sex with R.C.P. and also tried to have sexual intercourse with her. He videotaped at least one of these episodes and on another occasion used an Internet camera to broadcast his activities to his brother and his brother's girlfriend. He also forced R.C.P. to dress up in her mother's clothes and strip for him and forced her to watch pornographic videos with him, including a video he had made of her mother. B.J.'s sexual predations were not limited to R.C.P. He also had oral sex with E.C., one of R.C.P.'s female playmates. Neither R.C.P. nor E.C. told M.A.F. what B.J. had done to them.

B.J. also involved M.A.F. in his sexual depravity. She obtained pornographic videos for him. Many of these videos described the actors as "barely legal." On one occasion, she agreed to have sex with another man while B.J. videotaped them. On two other occasions, B.J. arranged for M.A.F. to have oral sex with C.J.O., an 11-year-old boy who lived nearby. B.J. videotaped the first episode, and during the second episode, M.A.F. engaged in sexual acts with B.J. and C.J.O. simultaneously.

In late 2001 and early 2002, B.J. began to use methamphetamine more and more. He gave the drug to M.A.F. before their two sexual episodes with C.J.O. Eventually, he began manufacturing the drug in his garage. It was at this point that M.A.F. tried to break free from B.J. In March 2002, she used her tax refund to rent a house in Monteagle, and she and R.C.P. moved out of B.J.'s garage in Manchester. Two weeks later, M.A.F. and R.C.P. returned to B.J. after he told her that he was suffering from an adverse reaction to chemotherapy for colon cancer.

By this time, M.A.F.'s parents and several of her co-workers had become aware of the physical abuse she was receiving from B.J., and they urged her to leave him. M.A.F. agreed that she should end the relationship but insisted that she needed to do it in her own way to avoid repercussions from B.J. In May 2002, M.A.F. was hospitalized for several days following a savage beating with a hammer. Again, a hospital social worker and others urged her to escape from the abusive situation.

On June 24, 2002, E.C. and C.J.O. informed local authorities of the sexual abuse committed by B.J. Representatives of the Coffee County Sheriff's Department and the Department of Children's Services interviewed the children the following day. During these interviews, C.J.O. told the authorities that B.J. had forced M.A.F. to have sex with him and that B.J. had also forced him

to have sexual contact with E.C. Armed with this information, the authorities obtained a search warrant for B.J.'s garage and living quarters. When they executed the search warrant, they found R.C.P. and B.J. at home. M.A.F. was at work. B.J. was taken into custody but later released.

The Coffee County Juvenile Court placed R.C.P. in the custody of the Department, and on June 26, 2002, the Department placed her in the first of two foster homes. R.C.P. was placed in her second foster home on July 2, 2002, where she has remained ever since. On the same day, the juvenile court appointed Frank Van Cleave, an attorney practicing in Tullahoma, to serve as R.C.P.'s guardian ad litem.

When questioned at the sheriff's office on the afternoon her daughter was taken into custody, M.A.F. expressed surprise when she learned what B.J. had done to R.C.P. She insisted that R.C.P. had never complained to her about B.J. and that she would never have believed that B.J. would physically or sexually abuse her daughter. Following additional interviews with R.C.P., the authorities charged B.J. with five counts of child rape and M.A.F. with two counts of child rape. B.J. disappeared shortly thereafter. M.A.F. moved back to McMinnville to be closer to her parents and soon discovered she was pregnant. She also changed her employment to another hospital.

On July 18, 2002, the Department prepared an initial permanency plan for R.C.P. The alternative goals for the plan were either to return R.C.P. to M.A.F. or to place her for adoption. The plan noted that M.A.F. had telephoned the Department frequently about R.C.P. and that M.A.F. had adequate housing and reliable transportation. It also imposed several obligations on M.A.F., including: (1) participating in counseling to enable her to "become knowledgeable about child sex abuse" and "to help her accept her paramour's role in the sexual molestation of her child," (2) participating in education "to become knowledgeable about the extreme and sometimes harmful behaviors displayed by victims of sex abuse," (3) enrolling in and completing a sex offender treatment program "if the . . . allegations against her are founded," (4) participating in counseling designed for victims of domestic violence, (5) obtaining a mental status evaluation, and (6) furnishing her home and assuring that it is free from safety and health hazards. The Department also informed M.A.F. that it expected her to complete these tasks by January 2003.

Thereafter, M.A.F.'s parents sought permission to intervene to obtain custody of R.C.P. On August 15, 2002, the juvenile court conducted a hearing on their request as well as the Department's petition for temporary custody. The court denied the grandparents' motion to intervene but granted them supervised visitation with their granddaughter. The court also determined that R.C.P. was dependent and neglected and placed her in the temporary custody of the Department. In its September 23, 2002 order embodying its decision, the court stated that "[M.A.F.] . . . did agree to a finding of severe abuse pursuant to T.C.A. §37-1-102 in that [B.J.] . . . did sexually abuse . . . [R.C.P.]; and [M.A.F.] . . . does not make any admissions of guilt."

On August 26, 2002, the juvenile court terminated M.A.F.'s supervised visitation with R.C.P. after a case worker decided that M.A.F. had not adequately corrected what she believed to be R.C.P.'s sexually suggestive behavior during a visitation. The court vacated this order one month later and determined that R.C.P.'s visitation would be supervised by the guardian ad litem rather than by the Department.

On September 3, 2002, the child's guardian ad litem filed a petition seeking to terminate M.A.F.'s parental rights because R.C.P. had been "subject to severe child abuse" or alternatively because M.A.F. was "an unfit parent, and that substantial harm will result to her child if the parental rights are not terminated."[1] On September 24, 2002, the Department followed suit by filing its petition to terminate M.A.F.'s parental rights on the grounds of abandonment and severe child abuse.[2]

M.A.F. was deposed on November 5, 2002. She insisted that she had never seen B.J. physically or sexually abuse either R.C.P. or E.C. and that she never suspected that B.J. would engage in inappropriate sexual conduct with R.C.P. She described the physical and psychological abuse she had received from B.J. between April 2000 and June 2002 and conceded that she had made a mistake by not leaving him. She also admitted renting pornographic videos at B.J.'s request and that B.J. had made a videotape of her having sex with another adult. However, she declined to answer questions regarding her sexual activities with C.J.O. or her use of methamphetamines.

B.J. was later apprehended and placed in custody. Only then did M.A.F. decide to assist the authorities in making their case against him. On January 8, 2003, she prepared a written confession admitting that B.J. had instigated her having oral sex with C.J.O. on two occasions and that B.J. had supplied her with methamphetamine on both occasions. She also confirmed that B.J. had videotaped one of these episodes.

Both R.C.P. and M.A.F. began individual counseling after R.C.P. was placed in foster care. Their therapists were working toward joint counseling, and M.A.F.'s counselor was encouraging her to apologize and to take responsibility for what had happened. During a visitation on January 30, 2003, M.A.F. tearfully told R.C.P. that she could not "apologize enough for what has happened." She also told her daughter that she did not know what had been going on at the time but that she believed her daughter's accounts of what B.J. had done to her. Both M.A.F. and R.C.P. discussed how B.J. had lied to them and had used them. M.A.F. also told her daughter that she had declined the Department's suggestion that she surrender her parental rights.

On February 27 and 28, 2003, the juvenile court conducted a hearing on both petitions to terminate M.A.F.'s parental rights. The guardian ad litem and the Department presented evidence, including the deposition given by M.A.F. and her confession, regarding the sordid events occurring while M.A.F. and R.C.P. had lived with B.J. R.C.P.'s case manager testified (1) that M.A.F. now had a clean, safe home, (2) that M.A.F. had completed every one of her obligations under the

---

[1] The contract between the Department and foster parents prohibits the foster parents from retaining counsel in anticipation of future adoption proceedings before the parental rights of a foster child's biological parents have been terminated. However, there is some evidence in this record that R.C.P.'s foster mother had a conversation with the child's guardian ad litem about hiring an attorney to help with the case and with future adoption proceedings.

[2] The Department filed its petition three months before the deadline it had given M.A.F. to accomplish her remedial tasks in the permanency plan. The timing of the Department's petition calls into question the wisdom of the Department's original decision to consider reuniting M.A.F. and R.C.P. Making reasonable efforts to reunite parents and children is not statutorily required in cases like this one. For the most part, imposing remedial tasks on a parent who has engaged in conduct violating Tenn. Code Ann. § 36-1-113(g)(4) only delays matters and raises false hopes that reunification will occur.

-4-

permanency plan, (3) that she had regularly visited R.C.P., (4) that M.A.F. and R.C.P. clearly love each other, and (5) that currently "there is nothing inappropriate that the mother does." In addition, M.A.F.'s therapist testified that she had a "high commitment level" to her therapy and counseling and that she was "beginning to absorb the significance" of what had happened. She recommended that M.A.F. "undergo a psychosexual evaluation to see if there is [sic] truly sexual predator issues for her, or is it that she is truly a victim, which at this point, everything that I'm seeing is that she is a victim and not a sexual predator."

The juvenile court made its decision shortly after the close of proof on February 28, 2003. It determined that the Department had failed to prove that M.A.F. had abandoned R.C.P. either by failing to visit her or by failing to support her. However, the court also determined that M.A.F. had committed severe child abuse in two ways. First, the court found that M.A.F. had committed severe child abuse on C.J.O. while he was a "temporary resident in her home." Second, the court concluded that M.A.F. had committed severe child abuse by "knowing and allowing the abuse by . . . [B.J.] to exist."[3] On March 6, 2003, the court filed written findings of fact, and on April 2, 2003, filed its "final" order terminating M.A.F.'s parental rights but reserving the issue of "placement and guardianship" for a later hearing.

Shortly after filing its written findings of fact, the trial court permitted M.A.F.'s trial counsel to withdraw from the case and appointed another lawyer to represent her on appeal. The Department prepared a revised permanency plan with adoption and placement with relatives as the alternative goals. This plan, which was ratified by the juvenile court in mid-April 2003, confirmed that R.C.P.'s foster parents desired to adopt her. On October 13, 2003, the juvenile court entered an order denying the custody petition of R.C.P.'s grandparents and directing that she remain in the Department's custody.

M.A.F. perfected this appeal, taking issue with the juvenile court's conclusion that she committed severe child abuse. The Department has not appealed from the juvenile court's dismissal of its abandonment claims. It has properly declined to defend the juvenile court's finding that M.A.F. violated Tenn. Code Ann. § 36-1-113(g)(4) with regard to C.J.O.[4] However, the Department

---

[3]The juvenile court expanded on this finding as follows:

> I further find that . . . [M.A.F.] knew of . . . [B.J.'s] proclivities for sexual abuse of children. She witnesses [sic] these tendencies, and she participated with him in the sexual abuse of a child.
> Further, . . . [M.A.F.] allowed to exist and helped to create an environment which can only be described as conducive to sexual deviancy and the exploitation of minors as sexual victims. She knew of . . . [B.J.'s] sexual interest in children, and she clearly had a sexual interest in children. She, in fact, participated in a criminal act with a minor child. She effectively allowed . . . [R.C.P.] to sleep in the same bedroom with her and . . . [B.J.] while many sexual escapades took place.
> I further find by clear and convincing evidence that the totality of the circumstances in this case is such that it is inconceivable to the Court that . . . [M.A.F.] was not reasonably certain that . . . [B.J.] would commit acts of sexual abuse toward . . . [R.C.P.], so I therefore find that grounds for termination exist pursuant to applicable law.

[4]Where the abused child was someone other than "the child who is the subject of the petition or . . . any sibling or half-sibling of such child," Tenn. Code Ann. § 36-1-113(g)(4) requires proof that the abused child was either
(continued...)

has requested this court to find that M.A.F. committed severe child abuse on R.C.P. under Tenn. Code Ann. § 37-1-102(b)(21)(A) - (C) (Supp. 2003).

## II.
### THE STANDARDS FOR REVIEWING TERMINATION ORDERS

A biological parent's right[5] to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions.[6] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 577-79 (Tenn. 1993); *Ray v. Ray*, 83 S.W.3d at 731. While this right is fundamental and superior to the claims of other persons and the government, it is not absolute. It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *Stokes v. Arnold*, 27 S.W.3d 516, 520 (Tenn. Ct. App. 2000); *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995).

Termination proceedings in Tennessee are governed by statute. Parties who have standing to seek the termination of a biological parent's parental rights must prove two things. First, they must prove the existence of at least one of the statutory grounds for termination.[7] Tenn. Code Ann. § 36-1-113(c)(1); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *Jones v. Garrett*, 92 S.W.3d at 838. Second, they must prove that terminating the parent's parental rights is in the child's best interests.[8] Tenn. Code Ann. § 36-1-113(c)(2); *In re A.W.*, 114 S.W.3d 541, 545 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever. Tenn. Code Ann. § 36-1-113(l)(1); *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 565 (1996); *In re Knott*, 138 Tenn. 349, 355, 197 S.W. 1097, 1098 (1917); *In re D.D.K.*, No. M2003-01016-COA-R3-PT, 2003 WL 23093929, at *8 (Tenn. Ct. App. Dec. 30, 2003) (No Tenn. R. App. P. 11 application filed). Because the stakes are so profoundly high, Tenn. Code Ann. § 36-1-113(c)(1) requires persons seeking to terminate a biological parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence. This heightened

---

[4](...continued)
temporarily or permanently residing in the perpetrator's home. The Department has correctly pointed out that the record contains no evidence that C.J.O. ever resided with B.J. or M.A.F.

[5]This right exists notwithstanding the marital status of the child's biological parents where a biological parent has established or is attempting to establish a relationship with the child. *Lehr v. Robertson*, 463 U.S. 248, 261-62, 103 S. Ct. 2985, 2993-94 (1983); *Jones v. Garrett*, 92 S.W.3d 835, 840 (Tenn. 2002); *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001). The right also extends to adoptive parents. *Simmons v. Simmons*, 900 S.W.2d 682, 684 (Tenn. 1995).

[6]U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8.

[7]The statutory grounds for terminating parental rights are found in Tenn. Code Ann. § 36-1-113(g).

[8]The factors to be considered in a "best interests" analysis are found in Tenn. Code Ann. § 36-1-113(i).

burden of proof minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d at 622. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003) (No Tenn. R. App. P. 11 application filed), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re C.D.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d at 733; *In re C.W.W.*, 37 S.W.3d at 474.

Because of the gravity of their consequences, proceedings to terminate parental rights require individualized decision making. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999). Accordingly, Tenn. Code Ann. § 36-1-113(k) explicitly requires courts terminating parental rights to "enter an order which makes specific findings of fact and conclusions of law" whether they have been requested to do so or not. *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *3 (Tenn. Ct. App. Nov. 25, 2003) (No Tenn. R. App. P. 11 application filed). These specific findings of fact and conclusions of law facilitate appellate review and promote just and speedy resolution of appeals. When a lower court has failed to comply with Tenn. Code Ann. § 36-1-113(k), the appellate courts must remand the case with directions to prepare the required findings of fact and conclusions of law. *In re D.L.B.*, 118 S.W.3d at 367; *In re K.N.R.*, No. M2003-01301-COA-R3-PT, 2003 WL 22999427, at *5 (Tenn. Ct. App. Dec. 23, 2003) (No Tenn. R. App. P. 11 application filed).

Because of the heightened burden of proof required by Tenn. Code Ann. § 36-1-113(c)(1), we must adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights. *Jones v. Garrett*, 92 S.W.3d at 838; *In re Valentine*, 79 S.W.3d at 547-49; *In re Adoption of Muir*, 2003 WL 22794524, at *2; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *10 (Tenn. Ct. App. June 3, 2003) (No Tenn. R. App. P. 11 application filed); *Ray v. Ray*, 83 S.W.3d at 733; *In re L.S.W.*, No. M2000-01935-COA-R3-JV, 2001 WL 1013079, at *5 (Tenn. Ct. App. Sept. 6, 2001), *perm. app. denied* (Tenn. Dec. 27, 2001).[9]

---

[9]These decisions draw a distinction between specific facts and the combined weight of these facts. Tenn. R. App. P. 13(d) requires us to defer to the trial court's specific findings of fact as long as they are supported by a preponderance of the evidence. However, we are the ones who must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion. The Tennessee Supreme Court used this approach in *In re Valentine* when it recognized the difference between the conclusion that a biological parent had not complied substantially with her obligations in a permanency plan and the facts relied upon by the trial court to support this conclusion. *In re Valentine*, 79 S.W.3d at 547-49; *see also Jones v. Garrett*, 92 S.W.3d at 838-39.

**III.**

**TERMINATIONS BASED ON A KNOWING FAILURE TO PROTECT UNDER
TENN. CODE ANN. § 37-1-102(B)(21)**

M.A.F.'s primary challenge to the juvenile court's termination of her parental rights focuses on the court's conclusion that her failure to protect R.C.P. from B.J. was "knowing" for the purpose of Tenn. Code Ann. § 37-1-102(b)(21). She insists that her conduct was not "knowing" because she had no actual knowledge of B.J.'s conduct. While we have concluded that the juvenile court employed the wrong standard in this case, we have determined that the record contains clear and convincing evidence that M.A.F. knowingly failed to protect R.C.P.

**A.**

Parents have a duty to provide, and children have a corresponding right to be provided with, a safe environment, free from abuse and neglect. *M.F.G. v. Dep't of Children & Families*, 723 So. 2d 290, 292 (Fla. Dist. Ct. App. 1998); *C.L.S. v. C.L.S.*, 722 S.W.2d 116, 121 (Mo. Ct. App. 1986); *In re S.D.S.*, 648 S.W.2d 351, 353 (Tex. Ct. App. 1983); *West Va. Dep't of Health & Human Res. ex rel. Wright v. Doris S.*, 475 S.E.2d 865, 879 (W.Va. 1996). Accordingly, Tenn. Code Ann. § 36-1-113(g)(4) empowers the courts to terminate the parental rights of parents who have committed "severe child abuse" upon their own child or on any other child residing temporarily or permanently in their home. Parents who have not themselves severely abused their own child may still be found to have committed severe child abuse if they knowingly exposed the child to, or knowingly failed to protect the child from, conduct constituting severe child abuse. Tenn. Code Ann. § 37-1-102(b)(21)(A) - (C).[10]

The terms "knowing" and "knowingly" are not defined in Tenn. Code Ann. § 37-1-102 or in any other statute pertaining to proceedings to terminate parental rights or other civil proceedings

---

[10]Tenn. Code Ann. § 37-1-102(b)(21) defines "severe child abuse" as follows:

(A) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great bodily harm or death;

(B) Specific brutality, abuse or neglect towards a child which in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or retardation, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct; or

(C) The commission of any act towards the child prohibited by §§ 39-13-502 – 39-13-504, 39-13-522, 39-15-302, and 39-17-1005 or the knowing failure to protect the child from the commission of any such act towards the child; or

(D) Knowingly allowing a child to be present within a structure where the act of creating methamphetamine, as that substance is identified in § 39-17-408(d)(2), is occurring.

involving juveniles. While the terms are defined in Tenn. Code Ann. § 39-11-106(a)(20) (2003),[11] the application of these definitions is expressly limited to Title 39 which deals exclusively with criminal offenses. Accordingly, we have determined that the juvenile court erred by basing its decision on the definition of "knowing" in Tenn. Code Ann. § 39-11-106(a)(20). While the rights at stake in a proceeding to terminate parental rights have constitutional significance, they are protected, not by importing criminal standards of mens rea into the proceeding, but rather by applying a heightened burden of proof.

The words "knowing" and "knowingly" do not have fixed or uniform meanings. Their meanings in particular cases vary depending on the context in which they are used or the character of the conduct at issue. *Still v. Comm'r of the Dep't of Employment & Training*, 657 N.E.2d 1288, 1293 n.7 (Mass. App. Ct. 1995), *aff'd*, 672 N.E.2d 105 (Mass. 1996); *State v. Contreras*, 253 A.2d 612, 620 (R.I. 1969). Because the parties have not supplied us with definitions of these terms, statutory or otherwise, we will employ the basic rules of statutory construction to ascertain their meaning. Accordingly, we will give these words their natural and ordinary meaning, *Frazier v. East Tenn. Baptist Hosp., Inc.*, 55 S.W.3d 925, 928 (Tenn. 2001), and we will construe them in the context of the entire statute and the statute's general purpose. *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000). We will also construe the words in a manner consistent with the rules of grammar and common usage.

The word "knowing," when used as an adjective, connotes a state of awareness. *In re D.P.*, 96 S.W.3d 333, 336 (Tex. Ct. App. 2001). Thus, it requires some inquiry into the actor's state of mind. A person's conduct is "knowing," and a person acts or fails to act "knowingly," when he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her. Persons act "knowingly" when they have specific reason to know the relevant facts and circumstances but deliberately ignore them.[12]

For the purpose of determining whether a parent's conduct runs afoul of Tenn. Code Ann. § 37-1-102(b)(21), parents who are present when a child is abused but who fail to intervene to protect the child have knowingly exposed the child to or have failed to protect the child from abuse. However, the "knowing" requirement in Tenn. Code Ann. § 37-1-102(b)(21) is not limited to parents who are present when severe abuse actually occurs. A parent's failure to protect a child will also be considered "knowing" if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur. *West Va. Dep't of Health & Human Res. ex rel. Wright v. Doris S.*, 475 S.E.2d at 878-879. Thus, this appeal requires us to determine whether this record contains clear and convincing evidence that M.A.F. had specific reason to know but

---

[11] The definitions of "knowing" and "knowingly" in Tenn. Code Ann. § 39-11-106(a)(20) are modified versions of the definitions in the American Law Institute's Model Penal Code § 2.02(2)(b) (1962).

[12] Knowing conduct differs from negligent conduct primarily because negligent conduct does not require a state of awareness. Mode Penal Code § 2.02(2)(b) cmt. 4. Conduct is "knowing" if the evidence indicates that the actor deliberately closed his or her eyes to avoid knowing what was taking place.

deliberately or recklessly ignored that B.J. either had severely abused R.C.P. or that it was highly probable that B.J. would severely abuse R.C.P.

**B.**

Neither the Department nor the guardian ad litem proved that M.A.F. was present when B.J. sexually abused her daughter or that she had actual knowledge that this abuse was occurring. However, the record contains evidence that proves clearly and convincingly that M.A.F. deliberately and recklessly disregarded the information she had regarding B.J.'s prurient interest in sex that made it likely that he would sexually abuse R.C.P.

M.A.F. knew that B.J. had a prurient interest in sex. She knew that he searched for and downloaded pornographic materials from the Internet. She knew that he watched pornographic videos because she obtained them for him. She had also personally participated in group sex that he arranged, and she allowed him to videotape her having sex with other partners.

In addition, M.A.F. knew that B.J. was a pedophile. Many of the pornographic videos she obtained for him characterized their actors as "barely legal." At B.J.'s instigation, M.A.F. herself engaged in oral sex with an eleven-year-old boy and permitted the boy to attempt to have sexual intercourse with her. On one occasion, she, B.J., and the boy had group sex. She also knew that B.J.'s sexual appetite was not limited to young boys. She was aware that B.J. had dressed R.C.P. in women's clothes and that he had taken a picture of R.C.P. wearing only a pair of M.A.F.'s thong underwear. On at least one other occasion, M.A.F. was sufficiently concerned about B.J.'s sexual proclivities to instruct E.C., who was eleven or twelve years old at the time, not to sit on his lap.

Reasonable persons possessing the information that M.A.F. possessed could only have concluded that B.J. was a pedophile. She deluded herself into assuming that B.J. had no sexual interest in R.C.P. despite his obvious sexual proclivities toward young children. In spite of her knowledge, M.A.F. routinely left R.C.P. with B.J. alone and unsupervised for many hours while she was away at work. By deliberately and recklessly ignoring that B.J. was an active pedophile and by routinely leaving R.C.P. in B.J.'s sole custody and control, M.A.F. committed severe child abuse as defined in Tenn. Code Ann. § 37-1-102(b)(21)(C) because she knowingly failed to protect R.C.P. from being raped by B.J.[13]

---

[13] We have concluded that the Department and the guardian ad litem did not clearly and convincingly prove a violation of Tenn. Code Ann. § 37-1-102(b)(21)(A) because of the absence of proof that B.J.'s conduct caused or could cause "great bodily harm or death." The Department asserts in its appellate brief that the evidence would also have supported finding a violation of Tenn. Code Ann. § 37-1-102(b)(21)(B). We disagree. The record does not contain the opinions of qualified experts that B.J.'s conduct, no matter how despicable, has or will produce severe psychosis, neurotic disorder, depression, developmental delay or retardation, or impairment of R.C.P.'s ability to function adequately in her environment.

# IV.
## M.A.F.'s "Duress" Defense

As a final matter, M.A.F. asserts that the juvenile court erred by failing to conclude that her failure to protect her daughter from B.J. should be excused because her ability to protect her daughter was undermined by B.J.'s physical and psychological abuse. We have determined that M.A.F. has failed to carry her burden of proving that her ability to protect her daughter was overridden by the treatment she was receiving from B.J.

Duress is a defense to prosecution in a criminal case. Tenn. Code Ann. § 39-11-504(a) (2003). It need not be raised as an affirmative defense in a criminal proceeding, and thus, a criminal defendant is entitled to an acquittal whenever the evidence raises a reasonable doubt regarding the existence of duress. *State v. Culp*, 900 S.W.2d 707, 710 (Tenn. Crim. App. 1994). However, proceedings to terminate parental rights under Tenn. Code Ann. § 36-1-113 are not criminal proceedings. Therefore, a defense based on duress in the context of a termination proceeding must be analyzed using civil, as opposed to criminal, procedural standards.

Duress is also an affirmative defense in civil proceedings. Tenn. R. Civ. P. 8.03. It consists of unlawful restraint, intimidation, or compulsion that is so severe that it overcomes the mind or will of ordinary persons. *Johnson v. Ford*, 147 Tenn. 63, 86, 245 S.W. 531, 538 (1922); *Dockery v. Estate of Massey*, 958 S.W.2d 346, 348 (Tenn. Ct. App. 1997). Parties seeking to rely on the defense in a civil proceeding must specifically plead it and then must introduce evidence supporting it. *Ass'n of Owners of Regency Park Condos. v. Thomasson*, 878 S.W.2d 560, 566 (Tenn. Ct. App. 1994) (a party asserting an affirmative defense has the burden of proving it).

The lawyer who originally represented M.A.F. did not specifically plead duress. Ignoring this oversight would be of little practical benefit to M.A.F. in this case because she failed to produce evidence sufficient to make out the defense. While M.A.F.'s therapist testified favorably for her at trial, the therapist was never asked to testify about the effects that B.J.'s physical and psychological abuse had on M.A.F.'s ability protect her child from B.J. The therapist never stated or implied that M.A.F.'s ability to understand, process, or act upon information was impaired because of the way that B.J. was treating her. Thus, the record contains no probative evidentiary basis for us to conclude that M.A.F. was unable to protect her child from B.J. because of the abuse she was receiving from him.

# V.

The record contains clear and convincing evidence that M.A.F. violated Tenn. Code Ann. § 36-1-113(g)(4) by knowingly failing to protect her daughter from B.J.'s severe child abuse and that terminating M.A.F.'s parental rights is in R.C.P.'s best interests. Accordingly, we affirm the judgment and remand the case to the juvenile court for whatever further proceedings may be required. We tax the costs of this appeal to the Tennessee Department of Children's Services.

_____

WILLIAM C. KOCH, JR., P.J., M.S.

-11-