IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 30, 2012

IN RE JAYCEE W.

Appeal from the Circuit Court for Perry County
No. 2010CV26     Robbie Beal, Judge

No. M2012-00524-COA-R3-JV - Filed February 27, 2013

This is a dependency and neglect case focusing on Jaycee W. ("the Child"), the minor daughter of Ellie H. ("Mother") and Jerry W. ("Father").[1]  At age five weeks, the Child suffered a suspicious broken leg.  Further examination revealed multiple other broken bones. The Department of Children's Services ("DCS") immediately took the Child into protective custody and filed a dependency and neglect petition alleging that the Child was severely abused in the custody of her parents.  Following an adjudicatory hearing, the juvenile court found that the Child was dependent and neglected and that both parents had committed severe child abuse.  Both appealed to the trial court.[2]  Following a trial de novo, the trial court made the same findings. Mother appeals the trial court's finding that she is guilty of severe child abuse.[3] We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Larry Joe Hinson, Jr., Hohenwald, Tennessee, for the appellant, Ellie H.

_____

[1]Apparently, the parents were never married to each other.

[2]All references to the "trial court" are to the Circuit Court for Perry County.

[3]Father also filed a timely notice of appeal.  Thereafter, this Court granted his motion to voluntarily dismiss his appeal.  We refer to Father only as is necessary to relate the relevant facts with respect to Mother's appeal.

Robert E. Cooper, Jr., Attorney General and Reporter, and Dianne Stamey Dycus, Deputy Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I.

Mother and Father had lived together with Marie H., the Child's maternal grandmother ("Grandmother"), in the latter's home for two years when the Child was born on December 3, 2009. Two weeks later, the Child was admitted to the hospital with feeding difficulties. After a ten-day stay, she was released on December 24 with a temporary feeding tube in place. X-rays taken during her hospitalization confirmed that the Child had no broken bones at that time. On Sunday, January 10, 2010, Mother and Father came to the emergency room and requested that the Child be examined for a bruise on her leg that they had noticed the night before. An x-ray revealed a fractured left tibia.[4] Mother advised the triage nurse:

> She has a fractured leg. We have no idea how it happened. We
> think it may be from sleeping in the bed. His momma watched
> her one day; my momma watched her one day.

The Child was treated and released.

Later that day, Child Protective Services ("CPS") received a referral on the Child. Mother spoke with an investigator by phone and said that the Child had been sleeping with her and Father and they may have rolled over on her causing the injury. CPS arranged to have the family transported back to the hospital the next day for a further examination of the Child. A full skeletal x-ray revealed, in addition to the fractured tibia, a fractured left femur[5] and four healing rib fractures, two on either side.

CPS and DCS personnel interviewed Mother and Father at the hospital on Monday. At trial, they testified to the information and statements they had received during the interview. Both Grandmother and the Child's paternal grandmother had briefly watched the Child three days earlier, on Thursday. Mother noticed that the Child's leg was swollen on Friday; by Saturday night, it was visibly bruised. Mother and Father said that the main

---

[4]Upper leg bone.

[5]Lower leg bone.

-2-

reason for their initial visit to the hospital on Sunday was because Father had injured his ankle while cutting wood at his father's house. When the DCS case worker asked if the Child would have been seen by a doctor if Father had not hurt himself, Father replied, "Probably not." Father described his own mother as "crazy" and suggested Grandmother could have injured the Child. At the hospital, the doctors met with Mother and Father with the investigators present. The doctors reported their findings and told the parents that the Child had sustained "forced injury." The parents "continued to state that they did not know for sure how this could happen." Mother and Father left the room to call Grandmother and inquire of her if she knew what had happened to the Child. When Mother and Father returned, "[Father] stated that [Grandmother] said that she had dropped [the Child] due to her knees giving out." The investigators further noted that Father was not employed in the two weeks between the time the Child was released from the hospital with a feeding tube and the time of the Child's emergency room visit. He reported being terminated from his job as a result of missing work during the Child's earlier hospitalization. Mother reported that she and Father had bad tempers, but felt Father's temper had improved since the Child was born. Both had been drug users in the past. The case worker also spoke with Grandmother by phone, who related that she had fallen on the Child that Thursday. DCS immediately took the Child into protective custody and filed a petition to declare the Child dependent and neglected and a victim of severe abuse.

Dr. Kris Parks Rehm, a pediatric hospitalist, saw the Child the day after her initial emergency room visit. The Child's hospital records reflected a reported fall on Thursday, swelling and decreased motion on Saturday, and an emergency room visit late Sunday night. Dr. Rehm found it troubling that medical care was not sought sooner for the injury. He estimated that the leg fractures had occurred within days of the Child's admission, while callus formations indicated that the rib fractures were "a bit older." Dr. Rehm concluded, to a reasonable degree of medical certainty, that the Child's injuries were due to "non-accidental trauma" and could have led to death. He explained that for a non-mobile, newborn infant, there was no other "possible explanation" for the multiple injuries of varying ages that the Child sustained. Dr. Rehm stated that the posterior rib fractures, in particular, were "very suggestive of inflicted trauma." The Child's injuries would have been painful, usually manifested in an infant by crying and fussiness. Dr. Rehm conceded that there were often no symptoms of a fracture and a parent or even a pediatrician might not be aware of such an injury without an x-ray.

At trial, Grandmother testified that Mother called her from the hospital on January 10, 2010, and asked her to lie and say that she fell on top of the Child while holding the infant. Grandmother said she and Mother both panicked and she agreed to lie because she "didn't know what was actually going on." Grandmother said she should not have told investigators that she had fallen with the Child when she had not. Grandmother recalled that the parents

had been with the Child at the home of the Child's paternal grandfather in the days before January 10. When they returned, the Child's leg was bruised. Grandmother said she suggested "keeping an eye" on the leg even though the Child didn't seem to be in pain, but Mother became more concerned and took her to the hospital. Grandmother agreed that Father had hurt his ankle at his father's house, but insisted that "[t]he main reason that they went to the hospital was for that baby, not for him." Grandmother reiterated that she lied about falling with the Child because she and Mother both panicked since "me and her both knew she did not do this to her baby."

Grandmother testified that the parents did not have a good relationship. She described Father as a "very troubled young man" who was "abusive," "unstable," and "controlling." Father "kept Mother in the back of the home a lot" and Grandmother heard them arguing. She said it got "pretty bad" in the months before the Child was born. Grandmother witnessed Father use his fists to punch several large holes in the walls of her home in "one of his angry states." Grandmother testified that she and Mother discussed Father before the Child's birth. She stated that Mother had said she was very afraid of Father. Grandmother told Mother to "be careful." According to Grandmother, Mother primarily took care of the Child and Father was not left alone with the Child except when Mother was in another part of the house. Grandmother never witnessed Mother or Father harm the Child. Grandmother recalled one time she heard a loud noise and went to the parents' room to check on the Child; she saw Mother holding the Child and crying. Father ordered Grandmother to "get out." Several times, Grandmother kicked Father out of her home, with Mother in agreement, but he returned every time when the couple reconciled. Grandmother said that the parents had been separated since the time of the Child's removal, when they "got [Father] out for good."

In April 2010, a DCS investigator and a detective interviewed Mother again. At that time, Mother elaborated on her and Father's past relationship. Mother reported that Father physically abused her more than once both before and during her pregnancy. She found pills and evidence of Father's cocaine use in their home the month before the Child was born; Father said the items were "nothing." Father took his father's prescription medications, drank alcohol and was "violent" toward her. Mother had observed Father being "rough with [the Child] at times." She had seen Father bouncing the Child, then about four weeks old, up and down on his knee while saying, "[The Child] is not going to be a woozy." Mother reported that she would often go to the kitchen to cook "and she would leave [the Child] in the room with [Father] and then hear the Child scream." The investigator further noted Mother's statements to the effect that

> [w]hen [Mother would] go back in there and check on [the Child], [Father] would get mad. He would say things like, "Why do you have to come in here all the GD time." Overall,

> [Mother] stated that she thought that [Father] was jealous of . . .
> her and [the Child's] relationship.

Mother testified at the adjudicatory hearing. She was present at the proceedings in the trial court, but did not testify.[6] Other witnesses testified that since the Child's removal, Mother and Father had remained separated. Mother had become engaged and had a new child with her fiance. Following a DCS study of her current home, Mother retained custody of that child. In the months after the Child's removal, the juvenile court granted custody of the Child to Mr. and Mrs. B., a paternal aunt and her husband. The Child, age 2, continued to live with them at the time of the proceedings in the trial court.

In its final order, the trial court found that the Child was dependent and neglected and that both Mother and Father committed severe child abuse. The court ordered the Child to remain in the custody of Mr. and Mrs. B., and remanded the case to the juvenile court for a "post dispositional hearing." Mother filed a timely notice of appeal.

II.

Mother raises a single issue for this Court's consideration. As taken verbatim from Mother's brief, the issue is as follows:

> Whether the trial court erred when it found that [Mother] committed severe abuse pursuant to [Tenn. Code Ann.] § 37-1-102(b)(23) (2010).

III.

The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id*.; Tenn. R. App. P. 13(d). Whether the combined weight of the facts establish clearly and convincingly that the parent committed severe child abuse is a question of law, subject to de novo review with no presumption of correctness. ***In re Samaria S.***, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). Severe child abuse in a dependency and neglect case must be established by clear and convincing evidence. ***Id.; Tenn. Dep't of Children's Servs. v. David H***., 247 S.W.3d 651, 655 (Tenn. Ct. App. 2006). Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence, *see **In re Valentine,*** 79 S.W.3d 539, 546 (Tenn. 2002), and it should produce a firm belief or conviction with regard to the truth of the allegations sought

---

[6]Father did not appear at the adjudicatory hearing or in the trial court.

to be established. ***O'Daniel v. Messier,*** 905 S.W2d 182, 188 (Tenn. Ct. App. 1995); ***In re Estate of Armstrong***, 859 S.W.2d 323, 328 (Tenn. Ct. App. 1993).

IV.

We begin with a well-settled principle: "Parents have a duty to provide, and children have a corresponding right to be provided with, a safe environment, free from abuse and neglect." ***In re R.C.P.***, M2003-01143-COA-R3-PT, 2004 WL 1567122 at \*6 (Tenn. Ct. App. M.S., filed Jul. 13, 2004)(citing ***M.F.G. v. Dep't of Children & Families***, 723 So. 2d 290, 292 (Fla. Dist. Ct. App. 1998); ***C.L.S. v. C.L.S.***, 722 S.W.2d 116, 121 (Mo. Ct. App. 1986); ***In re S.D.S.***, 648 S.W.2d 351, 353 (Tex. Ct. App. 1983); ***West Va. Dep't of Health & Human Res. ex rel. Wright v. Doris S***., 197 W. Va. 489, 475 S.E.2d 865, 879 (W.Va. 1996)). In the case at bar, the trial court found that the Child was dependent and neglected in her parents' care pursuant to Tenn. Code Ann. § 37-1-102(b)(12)(B)(C)(F) and (G) (2010).[7] The trial court expressly found that the Child's injuries were "intentionally caused" and the result of severe child abuse. Specifically, the court found that Father perpetrated the abuse by "rough-housing [the] newborn infant," thereby knowingly using force on the Child that was likely to cause great bodily injury. The court found that Mother also committed severe abuse when she "knowingly and repeatedly exposed the [C]hild to and knowingly failed to protect the [C]hild from Father" and his abuse – abuse that was likely to and did, in fact, cause great bodily injury. As relevant herein, "[s]erious bodily injury to the child" includes "a fracture of any bone." Tenn. Code Ann. §§ 37-1-102(b)(23)(A)(ii), 39-15-402(d). (Supp. 2012).

Mother challenges only the trial court's finding that she is guilty of severe child abuse. She essentially argues that there is no evidence that she "knowingly" exposed the Child to

---

[7]The cited provisions of Section 37-1-102(b)(12) define a "dependent and neglected child" as a child:

> (B) Whose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child;
> (C) Who is under unlawful or improper care, supervision, custody or restraint by any person, corporation, agency, association, institution, society or other organization or who is unlawfully kept out of school;

> \*   \*   \*

> (F) Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others;
> (G) Who is suffering from abuse or neglect;

or failed to protect the Child from severe abuse by Father. She reasons that there was nothing she did and that she was not privy to facts that would have led her to recognize that Father severely abused the Child or that it was highly probable he would do so. We disagree.

As relevant to Mother's appeal, the statute defines "severe child abuse" as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death . . . ." Tenn. Code Ann. § 37-1-102(b)(23)(A)(i). With respect to the "knowing" element of a severe abuse claim in a dependency and neglect proceeding, this Court has stated:

> A person's conduct is "knowing," and he or she acts, or fails to act, "knowingly" when he or she has actual knowledge of the relevant facts and circumstances, or when he or she is either in deliberate ignorance of, or in reckless disregard of, the information that has been presented to him or her. *In re H.L.F.*, 297 S.W.3d 223, 235 (Tenn.Ct.App.2009). Persons act "knowingly" when they have specific reason to know the relevant facts and circumstances, but deliberately choose to ignore them. *In re R.C.P.*, No. M2003–01143–COA–R3–PT, 2004 WL 1567122 (Tenn.Ct.App. July 13, 2004).

*In re Michael R.O., Jr.*, W2011–02488–COA–R3–PT, 2012 WL 1884699 at *5 (Tenn. Ct. App. M.S., filed May 24, 2012).

In support of its ultimate conclusion that Mother was guilty of severe child abuse, the trial court made extensive findings of fact. The court stated as follows:

> On initial interview in January 2010, [Mother and Father] denied that they caused these injuries to the [C]hild. In fact, the parents called . . . Maria H., and asked her to lie and say that she had fallen while holding the [C]hild.
>
> Mother disclosed to DCS and law enforcement that she continued to allow Father to care for the Child and left him alone with the Child despite her concerns and/or knowledge of the following:
>
> Mother knew Father was violent. . . ;

[The] Child would scream out at times while alone with Father. . . ;

Mother was concerned that Father was too rough with the [C]hild. . . ;

Violence by Father [against] Mother began occurring two months after Mother and Father began dating. . . ;

Father pushed, shoved, and hit Mother multiple times. . . ;

Mother caught Father "shooting up" illegal drugs a month before the [C]hild was born and found a "burned spoon". . . ;

Mother never sought help from Father's abuse;

Mother expressed she had concerns of leaving the [C]hild alone with Father. . .;

Father punched multiple holes in the walls of the family's home . . .;

Mother suffers from anxiety for which she is prescribed Xanax;

Father was defensive on multiple occasions when Mother heard the [C]hild cry . . .;

Mother witnessed Father "rough-house" with the newborn [C]hild and expressed concerns. . . .

The fact that Mother may not have actually witnessed Father inflicting injury does not make her any less culpable for the abuse the Child certainly suffered. The trial court accurately summarized the many reasons – many given by Mother herself – that caused Mother concern and should have prevented her from entrusting the care of the fragile infant to Father for any length of time, even while Mother was present elsewhere in the home.

Again, parents who have not themselves severely abused their child may still be found to have committed severe child abuse if they knowingly exposed the child to, or knowingly failed to protect the child from, conduct constituting severe child abuse. Tenn. Code Ann. § 37-1-102(b)(23)(A) - (C). Armed with the knowledge and concerns she had,

Mother offered no real explanation for the Child's injuries when first confronted with them at the hospital. In our view, Mother's decision to call and ask Grandmother to lie about the cause of the injuries is perhaps the most glaring example of her failure to act on behalf of the Child. Mother by then knew that the Child needed protection, but chose instead to shield Father. In doing so, she initially allowed the Child to return home to live in the presence of Father. It was not until months later, long after the Child was removed and Mother and Father had separated, that Mother was first forthcoming with investigators. At that time, Mother made statements that implicated Father as the person responsible for inflicting the injuries that the Child sustained. Among Mother's statements to her, the DCS investigator testified to the following:

> [Mother] had remembered that [she had] left [the Child] alone with [Father] for 72 hours before [the Child] had to go to the emergency room. She remembered that . . . [the paternal grandmother] had also kept [the Child] while [Father] cut wood on . . . Thursday. [Mother] stated she had not seen [Father] do anything to hurt [the Child], but if she had to choose between someone hurting [the Child], it would be [Father].

> [Mother] said she would pick [Father] because of the way that they fought with one another. She said it would probably be [Father] who had did [sic] something to [the Child] – got mad and did something to [the Child].

The trial court found that Father directly perpetrated the severe abuse on the Child – then a five-week-old infant who relied on a newly inserted feeding tube – by handling her in a manner that inflicted multiple fractures over the course of a few weeks thereby causing her serious bodily injury. In summary, Mother knew Father could be "violent," had seen Father handling the Child roughly, heard the Child scream while alone with Father, and expressed concern about leaving the Child with Father. Given the evidence before us, Mother's position that there were no signs to indicate that Father had severely abused the Child or that severe child abuse by Father was highly probable to occur is wholly unpersuasive.

The evidence does not preponderate against the trial court's findings. We conclude that there is clear and convincing evidence to support the trial court's finding that Mother committed severe child abuse when she "knowingly exposed the [C]hild to and knowingly failed to protect the [C]hild from abuse that was likely to cause great bodily harm." The trial court did not err, and we reject Mother's argument to the contrary.

V.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Ellie H. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and for the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE